**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BINGXU JIN,

*Petitioner*,

v.

ERIC H. HOLDER, JR., Attorney General,

*Respondent*.

No. 10-72413

Agency No.
A099-062-080

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 6, 2014—Seattle, Washington

Filed April 14, 2014

Before: Raymond C. Fisher, Ronald M. Gould,
and Morgan Christen, Circuit Judges.

Opinion by Judge Gould

## SUMMARY[*]

### Immigration

The panel denied a petition for review of the Board of Immigration Appeals' denial of asylum and withholding of removal on adverse credibility grounds.

The panel held that substantial evidence supported the agency's reasonable determination that petitioner was not credible under the totality of the circumstances based on his non-responsive demeanor during cross-examination, his affirmative misrepresentations of his residency for the purpose of gaining an advantage in forum, his submission of a fraudulent church membership certification for the purpose of gaining an advantage in forum, and the lack of detailed testimony.

### COUNSEL

Jisheng Li (argued), Law Office of Jisheng Li, Honolulu, Hawaii, for Petitioner.

Daniel Eric Goldman (argued), Attorney; Tony West, Assistant Attorney General; William C. Peachey, Assistant Director; Rebecca Hoffberg, Trial Attorney, United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for Respondent.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

# OPINION

GOULD, Circuit Judge:

Bingxu Jin petitions for review of the Board of Immigration Appeals' order dismissing his appeal of an immigration judge's denial of his application for asylum, withholding of removal, and relief under the Convention Against Torture. We have jurisdiction under 8 U.S.C. § 1252, and we deny the petition for review.

## I

Jin, a native and citizen of China, entered the United States in April 2005 as a non-immigrant visitor authorized to stay for a month. In October 2005, Jin filed an application for asylum and withholding of removal with the Department of Homeland Security. Jin subsequently received a Notice to Appear, charging him with failure to comply with the conditions of his admission to the United States. Jin conceded removability, and appeared in front of a Los Angeles immigration judge in January 2006, where he confirmed the Los Angeles residence in his application. In April 2006, Jin filed an unopposed motion to change venue to Tucson, Arizona, and submitted a Tucson address in support of his venue change motion. The Los Angeles court granted Jin's motion. In June 2007, Jin filed a second unopposed motion to change venue to Las Vegas, Nevada, including a declaration that he moved to Las Vegas, and it would be inconvenient for him to travel to Tucson for his immigration proceedings. The Tucson court granted Jin's second motion to change venue.

## A

In his asylum application, Jin submitted a two-page written affidavit that described Jin's first encounter with Christianity, and an alleged incident with Chinese police at a Christian family church. Jin portrayed the events as follows:

Jin was introduced to Christianity on a trip to Malaysia in June 2002, where he met Zhao Xiaodong. Zhao "passed the Gospel" to Jin and told Jin "the Bible story." After their return to China, Zhao gave Jin a Bible and invited Jin to attend Zhao's family church, which met at Zhao's home. Jin joined Zhao's family church in September 2002, and was baptized on Christmas that year.

On November 14, 2004, three policemen broke into Zhao's house, confiscated Bibles and Gospel materials, and took Jin and other members to the local police station, where they interrogated Jin about alleged anti-government activity. The police demanded that Jin "confess" the identities of other family church agitators. Jin said that he did not know, and the police beat him with batons, and then took him to a detention center where he was confined until November 23, 2004. Jin was again interrogated and beaten at the detention center. Jin felt dizzy and weak because he was starving. His wife paid 9,000 Renminbi to gain his release. Before he departed, police told Jin to write a letter of repentance and to report weekly. Jin was hospitalized for seven days, during which time he learned that he had lost his job. Jin eventually obtained a United States visa. After Jin arrived in the United States, his wife, who was still in China, told him that police came to their house and said that they would punish Jin severely if they caught him.

**B**

Jin's case was heard by a Las Vegas immigration judge in July 2009. On direct examination, Jin's testimony repeated the facts from his application affidavit, apart from stating the date of arrest as November 23, 2004, which Jin later said was November 14, 2004. On cross-examination about his introduction to Christianity, Jin testified that Zhao "told me some Bible stories and spread Gospel to me" during his five-day trip to Malaysia. Jin testified that he did not practice any religion before 2002 because he thought there was no purpose, but that the Christians in Zhao's church moved him because they were "gentle, kind and gracious."

On cross-examination about his contact with the family church members after their arrest, Jin testified that he was separated from everyone else and did not know what happened to Zhao or to the other members. Jin stated that neither he nor his family had further contact with the church members after his release because he was under surveillance. Jin said that he never heard what happened to the other members. When asked if he was concerned for them, Jin said that he could only think of himself at the time.

The government also cross-examined Jin about his residence since arriving in the United States. Jin said that he first lived in Los Angeles, then moved to Tucson. This prompted the following exchange:

> Government: Do you remember the address?
>
> Jin: 3000 West Ina Street – Ina Road, Tucson.

> Government: Isn't that actually a shopping plaza in Tucson?
>
> Jin: It's not a shopping plaza.
>
> Government: Are you sure it's not a business named New China Super Buffet?
>
> Jin: I don't quite know because I do not have any recollection.

Jin then testified that he lived in Tucson for "a few days" and left when there were no jobs, noting that his life at that time was "not stable." Jin testified that he would stay with friends in Tucson. The IJ requested clarification about whether Jin lived in Tucson for a few days or for a year, as set out in his application, to which Jin responded: "[W]ell, I stay there, for about one year but, when there's no work there, I return to Los Angeles."

The government submitted a photo of the Tucson address Jin had given, as well as documents indicating that the address belonged to a commercial shopping center with a full-service restaurant. The government returned to the question of whether Jin had lived at the Tucson address and Jin said that he was not sure.

Jin then explained that he moved his case to Tucson "[b]ecause the attorney's office said that it's easier to have a lawsuit there." When asked directly whether he ever lived in Arizona, Jin replied that he did not live in Arizona but stayed with friends. The government again asked why Jin moved his case to Arizona when he was not living there, to which Jin responded, "At that time, my friends told me that I could find

a job there, but I couldn't." The IJ interjected that Jin's answer was non-responsive, and Jin then said that he was told his immigration case would follow him to Arizona. Jin testified that he received the "3000 West Ina Road" address in Tucson from a friend. When again asked whether he moved his case to get an "easier" immigration judge for his asylum claim, Jin conceded, "Well, these kind of thoughts, more or less, play as a factor."

The government then asked Jin what evidence he had to prove that he lived in Las Vegas, to which Jin responded, "Well, I live in Las Vegas." Jin did not have a valid Nevada driver's license, and his expired license showed a California address. When asked about the last time he lived in Los Angeles, Jin testified: "I live in two places. I'm just coming back and forth." The IJ again questioned Jin about transferring his case out of Los Angeles, and Jin confirmed that he sought the venue transfer because his attorney told him that it would be easier to get his asylum application approved in another state.[1] The IJ asked Jin where he spent most of his time living, to which Jin again responded that he went back and forth between Los Angeles and Las Vegas. When told his answer was not responsive, Jin said that he spent most of his time in Los Angeles, at the address he used to get his work authorization and his last driver's license. Jin stated that the percentage was "half and half" because there was no work in Los Angeles, but also no work in Las Vegas. Jin further testified that if his case was not transferred to Las Vegas, he would not come to Las Vegas because he did not know the city.

---

[1] On redirect, Jin changed his testimony to say that a man in Los Angeles, not his current attorney, advised him to move his case.

Jin had previously testified on direct that he attended church in Las Vegas. In support, Jin had submitted a May 24, 2009 Certificate of Membership in the Korean Evangelical Church of America Praise Church of Las Vegas, in which the Senior Pastor of the Las Vegas church stated that Jin attended worship services on Sundays and had been a member since July 2007. Jin testified that he had asked his pastor to come to his immigration hearing back in May, but his pastor was too busy. Because his pastor could not appear, Jin had obtained his pastor's certification as proof.

After Jin's admission that he went back and forth between Los Angeles and Las Vegas, the IJ questioned whether Jin was a regular member of the Las Vegas church. Jin in answer responded, "Well, I told my pastor, I begged her to help me out – I begged him to help me out because I told him that's what was said on my materials, that I came here around that time period." The IJ struck the answer as non-responsive, and asked again about Jin's church membership in Las Vegas. Jin then said that he went to church in Las Vegas for the last two months, but for most of the time he had been at the church in Los Angeles.

The IJ then returned to the police incident in China, leading to the following exchange:

> IJ: Now, let's go back to that incident when the police rushed in. Do I understand – did they knock on the door before they entered? How did they enter? If you can just describe it.
>
> Jin: Is he talking about the day when we were arrested?

IJ: Of course that's what I'm talking about.

Jin: Well, it was on November 14, the year 2004 –

IJ: Yes, sir. I understand that.

Jin: – in the morning. I –

IJ: At 10:00. Yes. You've already said that in your – it's in your declaration. I have a simple question. How did – sir, please. Listen. How did the police gain entry into that gathering?

Jin: Well, at that time, the police just knocked on the door.

IJ: And did someone open the door?

Jin: Yes.

IJ: And then they, they came in?

Jin: Somebody opened the door. Well, so I don't ask who, who it is, then –

IJ: All right, the answer is not responsive. I'm going to ask you – you know, just listen to the questions. You are providing information in almost every question that you're being asked that we're not asking you about.

Jin then confirmed that the police knocked and someone opened the door. The IJ revisited Jin's testimony on his arrest and interrogation, then reviewed Jin's knowledge of Christianity. Jin testified that his understanding of the Bible was that "if you believe, then you will be saved. Your sin can be saved. You will have everlasting life."

## C

In an oral decision, the IJ made observations about Jin's poor demeanor and questionable credibility: Jin's demeanor on cross-examination was evasive or non-responsive when questioned about his residence. Jin's demeanor reinforced that he had only lived in Los Angeles, not in Tucson or Las Vegas, as he had fraudulently represented to the immigration courts to obtain changes of venue for his immigration proceedings. The address Jin gave for his Tucson residence was that of a restaurant. Only after further questioning did Jin admit that he had never lived in Tucson and had also never lived in Las Vegas. Jin sought changes in venue hoping that his application would fare better outside of Los Angeles. Jin lacked evidence to show that he had ever lived in Las Vegas, and told the truth–that he had continued to live in Los Angeles–only when pressed by the government and IJ. Jin also admitted that he did not regularly attend church services in Las Vegas, and that his certification of membership in the Las Vegas church was false.

The IJ denied relief on three grounds: (1) that Jin lied under penalty of perjury in his change of venue documents where he fabricated his residences in Tucson and Las Vegas; (2) that Jin submitted a fraudulent certification of church membership in Las Vegas; and (3) that Jin provided very general testimony about the police incident in China,

including a misstatement of the date of the alleged incident. The IJ also noted that Jin had made no attempt to contact the other alleged members of the family church after they were all arrested. Observing that this was a "clear case of forum shopping," the IJ made an adverse credibility determination and denied Jin's application for asylum and withholding of removal.[2]

The BIA determined that the totality of the circumstances supported the IJ's adverse credibility finding based on: (1) Jin's non-responsive and evasive testimony; (2) Jin's lack of detail when testifying about his religious beliefs; and (3) Jin's attempt to defraud the immigration courts by lying about his residence and place of worship. The BIA noted that Jin admitted lying about his residence to obtain a "more favorable immigration proceeding" and referred to Jin's non-responsive and evasive demeanor during his testimony. Citing *Shrestha v. Holder*, 590 F.3d 1034, 1043-44 (9th Cir. 2010), the BIA observed that Jin's misrepresentations and "other credibility issues" did not have to concern the "heart" of Jin's claims for relief. Accordingly, the BIA affirmed the IJ's denial of Jin's application for asylum and withholding of removal.

---

[2] The IJ also found that there was no evidence that Jin would be tortured by Chinese officials upon return to China, and rejected Jin's CAT claim. The BIA dismissed Jin's CAT claim on similar grounds. Jin waived any challenge to the agency's CAT determination because he did not raise CAT relief in his opening brief. *See Husyev v. Mukasey*, 528 F.3d 1172, 1183 (9th Cir. 2008).

## II

Where the BIA's "phrasing seems in part to suggest that it did conduct an independent review of the record, but the BIA's analysis on the relevant issues is confined to a simple statement of a conclusion, we also look to the IJ's oral decision as a guide to what lay behind the BIA's conclusion." *Id.* at 1039 (internal quotation marks and citation omitted). We review the agency's adverse credibility determination for substantial evidence. *Id.*; *Soto-Olarte v. Holder*, 555 F.3d 1089, 1091 (9th Cir. 2009). The REAL ID Act "significantly restricted" appellate review of adverse credibility findings, whereby "only the most extraordinary circumstances will justify overturning an adverse credibility determination." *Shrestha*, 590 F.3d at 1041 (quoting *Kaur v. Gonzales*, 418 F.3d 1061, 1064 n.1 (9th Cir. 2005), and *Jibril v. Gonzales*, 423 F.3d 1129, 1138 n.1 (9th Cir. 2005)).

## A

The REAL ID Act directs the agency to make a credibility determination based on the "totality of the circumstances" and "all relevant factors" in determining credibility. 8 U.S.C. § 1158(b)(1)(B)(iii); *Shrestha*, 590 F.3d at 1040; *see also Ling Huang v. Holder*, No. 09-72837, 2014 WL 949118, at *2–4 (9th Cir. Mar. 12, 2014). The statute specifies the following credibility factors: "demeanor, candor, responsiveness of the applicant or witness, the inherent plausibility of the applicant or witness's account, consistency between the applicant or witness's written and oral statements, internal consistency of each statement, and consistency of statements with other evidence." *Shrestha*, 590 F.3d at 1040; *see* 8 U.S.C. § 1158(b)(1)(B)(iii). We have observed that these statutory factors are not exhaustive, and

that the agency can look to relevant pre-REAL ID Act factors, such as the "level of detail of the claimant's testimony." *Shrestha*, 590 F.3d at 1040. At the same time, the agency cannot be selective in its evaluation of credibility; the agency's analysis must be reasonable as a whole. *Id.* at 1040–41. The REAL ID Act permits the agency to consider any inconsistency in the petitioner's testimony, regardless of whether the inconsistency implicates the "heart" of the petitioner's claim for relief. *Id.* at 1043. But utterly "trivial inconsistencies" that "have no bearing on the petitioner's veracity" cannot form the basis for an adverse credibility determination. *Id.* at 1043–44.

The agency is required to give "specific and cogent reasons supporting an adverse credibility determination" to assist appellate review. *Id.* at 1042.

## B

Here, the agency properly considered the totality of the circumstances in evaluating Jin's credibility. *See id.* at 1040. The IJ considered Jin's non-responsive demeanor, his misrepresentations of his residence, his fraudulent church membership certification, and his lack of detail in his testimony on the alleged police incident in China. The BIA similarly considered Jin's demeanor, misrepresentations and fraud, and lack of detail, but on this the BIA focused on Jin's statements about his religious beliefs.

## 1. Evasive and Non-Responsive Demeanor

Jin contends that the agency did not provide specific examples of Jin's non-responsive or evasive testimony. The IJ is not required, however, to provide a "pinpoint citation" to

the record, but rather to identify the instances where the petitioner is non-responsive. *Id.* at 1045. Here, the IJ explained that Jin was not responsive when he was asked by the government about his residence. The record supports the agency's demeanor finding, as there are many instances where the IJ explicitly said that Jin's answer was non-responsive, such as: Jin's responses to the government's questions about the duration and nature of his residence in Tucson; Jin's responses to the IJ's question about how much time Jin spent in Los Angeles as compared to Las Vegas; and Jin's responses to the IJ's question about the duration of Jin's regular church membership in Las Vegas. The record further reflects that Jin evaded questions about subjects other than his residence, such as when the IJ questioned Jin about how the police entered the family church during the alleged police incident. While the IJ's oral decision and BIA's order did not refer to every example of Jin's non-responsive testimony, the record amply demonstrates a pattern of evasive responses that, when pursued by the government and IJ, led to Jin's admissions and the giving of a more accurate answer. *See id.* ("[T]he record's demonstration that Shrestha's unresponsiveness was a pattern throughout the hearing is one of the circumstances that the REAL ID Act entitles the agency to consider in assessing Shrestha's credibility.").

## 2. Misrepresentations of Residence

Jin contends that the IJ mischaracterized the record when the IJ determined that Jin perpetrated a fraud on the immigration courts. We disagree. There is no question that Jin misrepresented his residence in both of his motions to change venue. Jin's persistent misrepresentations to the immigration courts in Los Angeles, Tucson, and Las Vegas are significant because they were made in an attempt to gain

a better forum for Jin's application. Jin eventually admitted that a friend gave him the Tucson address, which was actually that of a Chinese restaurant, and that he never lived in Tucson but only stayed with friends. Jin also admitted that he spent most of his time in Los Angeles, and did not know Las Vegas, despite his declaration to the contrary indicating that it would be an inconvenience to keep traveling to Tucson from Las Vegas. Jin eventually revealed that if his immigration case had not been in Las Vegas, he would have been in Los Angeles. Jin may have been looking for work in Tucson or Las Vegas, but he also admitted that he submitted phony addresses in those locations to gain a better forum.

Substantial evidence supports the agency's conclusion that Jin never resided in Tucson or Las Vegas, and that his motions to change venue to those locations were fraudulent. These misrepresentations of residence are relevant to Jin's credibility because they show Jin's purpose of forum shopping, and his dishonesty with the immigration court. These false statements to change venue are clearly more than typographical errors or utterly trivial inconsistencies. *See id.* at 1043–44.

### 3. Fraudulent Church Certification

Jin contends that he maintained consistent church attendance if the duration specified on the Las Vegas church certification includes the time Jin spent at the Los Angeles branch of the same Korean church. We reject this argument. To the contrary, that contention demonstrates how Jin continued to live in Los Angeles and did not in fact live in Tucson or Las Vegas. Jin's testimony revealed that he had only attended the church in Las Vegas for the past couple of months, not the two years specified in the certification. Jin

eventually admitted in his testimony that he begged his pastor to help him, prompting the fraudulent certification many months before his immigration hearing. We are also not persuaded that Jin honestly revealed his misrepresentation in front of the IJ. The record reflects that Jin continued to make false statements in front of the Las Vegas immigration judge before admitting falsity when questioned further by the government or by the IJ.

## 4. Lack of Detail

Jin contends that the BIA erred in concluding that Jin did not give sufficient details of his religious beliefs. The record reflects that Jin provided little depth in his description of how he was introduced to Christianity and what it means to him to be Christian. In the context of this case, the BIA appropriately considered Jin's "lack of detail" about his Christian beliefs as one factor in evaluating Jin's credibility under the totality of the circumstances.

The IJ also cited Jin's "very general" testimony about the alleged incident with police in China, referring to Jin's misstatement of the date of the incident and Jin's lack of contact with other members of the family home church after the members' alleged detention. The record further reflects that Jin first said in his affidavit that the police "broke into" the family church, but only upon persistent questioning by the IJ did Jin change his testimony to say that someone in the home church opened the door for the police. Non-trivial incongruities in Jin's account of this key incident foundational to Jin's asylum claim are relevant to evaluating Jin's credibility under the totality of the circumstances.

As we noted in *Shrestha*, the REAL ID Act does not dictate the weight the agency must give to each relevant factor. *Id.* at 1040. Here, the agency cited Jin's lack of detail in his knowledge of Christianity and his account of the police incident in China, but gave more weight to Jin's non-responsive demeanor, Jin's repeated misrepresentations of his residence, and Jin's submission of a fraudulent church membership certification.

We conclude that substantial evidence supports the agency's reasonable determination that Jin was not credible under the totality of the circumstances. Those circumstances include: (1) Jin's non-responsive demeanor during cross-examination; (2) affirmative misrepresentations of his residency for the purpose of gaining an advantage in forum; (3) submission of a fraudulent church membership certification for the purpose of gaining an advantage in forum, and (4) lack of detailed testimony. In the absence of credible testimony, the agency properly denied Jin's asylum and withholding of removal claims. *See id.* at 1048.

**PETITION FOR REVIEW DENIED**.