**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERTO CARLOS SILVA-PEREIRA, *Petitioner*, v. LORETTA E. LYNCH, Attorney General, *Respondent*. | No. 14-70276 Agency No. A095-743-748 OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted January 4, 2016
San Francisco, California

Filed July 7, 2016

Before: J. Clifford Wallace and Diarmuid F. O'Scannlain,
Circuit Judges and Marilyn L. Huff,[*] District Judge.

Opinion by Judge O'Scannlain

---

[*] The Honorable Marilyn L. Huff, District Judge for the U.S. District Court for the Southern District of California, sitting by designation.

# SUMMARY[**]

### Immigration

The panel denied a petition for review brought by Roberto Carlos Silva-Pereira, a former Salvadoran professional soccer player and deputy to a Salvadoran congressman, holding that he was statutorily barred from asylum and withholding of removal relief under the serious nonpolitical crime bar, and did not qualify for protection under the Convention Against Torture.

The panel held that the evidence did not compel the conclusion that Silva was credible. The panel further held that substantial evidence supported the Board of Immigration Appeals' determination that Silva was ineligible for asylum and withholding of removal under the serious nonpolitical crime bar, because there was probable cause to believe that Silva was complicit in the murders in Guatemala of three Salvadoran representatives to the Central American Parliament.

The panel held that it need not decide whether the law of the case doctrine applies to administrative proceedings in the immigration context, because even assuming it does, neither the immigration judge nor the Board explicitly decided the serious nonpolitical crime issue before the final round of decisions.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel affirmed the Board's denial of protection under the Convention Against Torture, because Silva never asserted any fear of torture in Nicaragua, the country he designated for removal, and to which the IJ ultimately ordered removal.

The panel declined to consider the Board's determination that Silva failed to demonstrate a likelihood of torture in El Salvador, the alternate country of removal, because such a challenge does not relate to "the proposed country of removal," as required by 8 C.F.R. § 1208.16(c)(2).

---

## COUNSEL

Guatam Jagannath (argued), and Emily Abraham, Social Justice Collaborative, Oakland, California, for Petitioner.

Timothy G. Hayes (argued), Trial Attorney; Cindy S. Ferrier, Assistant Director; Benjamin C. Mizer, Acting Assistant Attorney General, Civil Division; Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether substantial evidence supports the determination of the Board of Immigration Appeals that this petitioner is ineligible for asylum and withholding of removal to Nicaragua and whether he qualifies for deferral of removal under the Convention Against Torture.

I

A

Roberto Carlos Silva-Pereira is a Salvadoran citizen and national, and was a professional soccer player in El Salvador until around 2000. Following his retirement, he entered the construction business in El Salvador with his wife. His companies bid for government construction contracts, which regularly yielded 30–40% profit. Earnings from these contracts placed Silva among El Salvador's wealthiest individuals. Silva denied he ever bribed government officials to secure such contracts.

Silva reports that he became involved in Salvadoran politics in 2000, when he became a member of the Frente Farabundo Martí para la Liberación Nacional Party ("FMLN"). In 2006, however, Silva changed parties when he was elected a deputy to Congressman Gonzales Lovo, a member of the Partido de Conciliación Nacional ("PCN"). Silva testified that although some members of the FMLN resented his switch to the PCN, he thought both parties had a shared ideology opposing the then-ruling Alianza

Republicana Nacionalista party ("ARENA"), which Silva believed to be corrupt.

Roughly six months after Silva assumed office as Congressman Lovo's deputy, the Salvadoran legislature held hearings about allegations that Silva engaged in money laundering and bribery of government officials through his construction business. At those hearings, the Salvadoran Attorney General presented evidence that Silva acquired approximately $1.6 million in illicit assets between 2004 and 2006 from contracts acquired through bribery. According to Silva, the charges were brought because the Attorney General believed him to be a "stumbling block" to the ARENA party.

Ultimately, 82 out of El Salvador's 84 legislators voted to suspend Silva's legislative immunity. The voting majority included all three parties and 9 out of 10 members of Silva's own PCN party, with the exception of Congressman Lovo who chose to abstain. The legislator who acted as a prosecutor in Silva's case also abstained. Silva claims that the legislature's landslide vote was orchestrated by ARENA and motivated by a desire to secure aid from the United States by demonstrating an active fight against corruption.

After the legislature revoked Silva's immunity, a Salvadoran court held hearings in January 2007 to determine whether the evidence against Silva supported the issuance of a warrant for his arrest. Silva was represented by counsel at these hearings, but submitted a note through his attorneys telling the court that he was too sick to attend. The court issued a warrant for Silva's arrest on January 25, 2007. Silva left El Salvador sometime during this period.

Around the time Silva's legislative immunity was suspended, Silva's wife and mother-in-law were also arrested on corruption charges connected to their role in Silva's construction businesses. His mother-in-law was acquitted. After being convicted of some charges and acquitted of others, Silva's wife was sentenced to seven years in prison. Additionally, authorities successfully prosecuted a former mayor, Mario Osorto, for forging documents that facilitated Silva's government contracts. Osorto was an ARENA party member and also a member of the Central American Parliament ("PARLACEN"). As with Silva, the Salvadoran legislature voted to suspend Osorto's legislative immunity in December 2006. Osorto was sentenced to four years in prison.

B

Subsequently, in the United States, Silva was apprehended by agents of the Federal Bureau of Investigation ("FBI") near his girlfriend's home in California in October 2007. When investigators knocked on the door, Silva fled on foot, jumping fences and hiding in bushes before being arrested. Following his arrest, Silva conceded removability but sought asylum, withholding of removal, and protection under the Convention Against Torture. He declined to designate a country of removal, so the immigration judge ("IJ") designated El Salvador, Silva's home country, as the country of removal.

1

At his initial immigration hearings before the IJ in Florence, Arizona, Silva described several incidents of violence allegedly perpetrated against him by Salvadoran

officials. First, he asserted that the leader of ARENA's legislators threatened him at gunpoint for accusing ARENA of corruption. Second, Silva alleged he suffered violence at the hands of Salvadoran police after visiting his wife in prison in El Salvador. According to Silva, he visited his wife in October 2006 and took pictures with his cell phone of injuries she allegedly sustained while incarcerated. Silva testified that upon leaving the prison, police stopped the car in which he was riding with his ten-year-old son and his driver. According to Silva, the police hit him with a rifle, forcibly took the phone, and threatened his son at gunpoint.

Third, Silva testified that roughly one week after this assault, police entered his house without a warrant and again assaulted him and frightened his children. Silva claimed he was unable to attend the arrest warrant hearings in El Salvador as a result of injuries from this incident. When government counsel pointed out that based on Silva's testimony, the alleged encounter in his home took place more than three months before the arrest warrant hearings, Silva claimed he had actually been beaten an additional time by "four people dressed as police" in January 2007.

Silva failed to report any of these incidents in his asylum application to the Department of Homeland Security. When asked why he failed to mention the incidents involving the police outside his wife's prison and in his home, Silva said he forgot to report them to his attorney. He also claimed that "[his] problem is very complex" and he worried that other Salvadoran detainees would "steal [his] declaration" and beat him.

On cross-examination, government counsel also questioned Silva about his alleged departure date from El

Salvador.  Silva testified that he crossed the Texas border in early January 2007 after spending only six hours or so in Guatemala and a handful of days in Mexico.  When government counsel pointed out that this timeline was inconsistent with the entry date to the United States that Silva reported in his asylum application, Silva testified that he actually exited El Salvador several weeks later than he initially indicated.  Silva subsequently admitted that he allowed his attorneys to tell a Salvadoran judge that he was too sick to attend the arrest warrant hearings when in fact he was fleeing the country.

2

Several experts hired by Silva testified that they believed the Salvadoran corruption charges were likely linked to Silva's opposition to the ARENA party.  One of these experts, a private investigator named Tom Parker, also presented a tape-recorded conversation in which Adolfo Torrez, a close confidant of the ARENA-affiliated president, told Silva he could make the charges against Silva and his wife disappear for a price of $500,000.  When Torrez's offer became public, the ARENA party withdrew its support for the Attorney General because he knew about Torrez's actions but failed to investigate.  Torrez subsequently died of a gunshot wound.  Parker speculated that Torrez was murdered, though other reports on the forensic evidence indicate that Torrez committed suicide.

The IJ also heard testimony from Silva's brother, who stated that Silva was protected by two bodyguards during his time as a legislator.  Following such testimony, the IJ recalled Silva and asked him whether his bodyguards were present during the incidents he recounted in which police assaulted

him outside the prison and at his home. Silva testified that only one bodyguard was present during each incident because they took turns every twenty-four hours. He also asserted that the bodyguard present during both incidents was unarmed and was also beaten by police.

### 3

In August 2008, the IJ rendered his first decision, concluding Silva was non-credible and denying his applications. In so finding, the IJ noted discrepancies between Silva's testimony and his asylum application concerning his exit date from El Salvador. The Board of Immigration Appeals ("BIA") reversed, finding that the IJ's limited discussion—and especially his focus on the date discrepancies—was inadequate to sustain the credibility determination.

### C

Following remand, the IJ conducted additional hearings between May and September 2009. During this time, the government introduced evidence that in addition to his crimes in El Salvador, Silva had also been charged with conspiracy to commit murder in Guatemala.

### 1

Exhibits and testimony at the second round of hearings established that in February 2007, three Salvadoran representatives to the Central American Parliament were found murdered in a charred van outside Guatemala City. Among the murdered PARLACEN representatives was Eduardo D'Aubuisson, the son of ARENA's founder and the

brother of Roberto D'Aubuisson, Jr., one of ARENA's current leaders. Later inquiry by international investigators concluded that the representatives were likely carrying $5 million and twenty kilograms of cocaine.

Guatemalan authorities initially arrested four Guatemalan police officers whom they believed carried out the murders in cooperation with a drug gang. Two weeks after being taken into custody, however, these four officers were gunned down inside a Guatemalan prison, prompting the Guatemalan government to seek out assistance from the FBI and a task force sponsored by the United Nations called the International Commission Against Impunity in Guatemala ("CICIG"). Guatemalan authorities subsequently charged and convicted a number of individuals for involvement in these killings, including a Guatemalan congressman named Manuel Castillo. Phone records showed Castillo placed calls to both the corrupt police and the drug gang involved in the hit on D'Aubuisson and his companions. Castillo was sentenced to 203 years in prison.

During Castillo's trial, Guatemalan authorities offered evidence that Silva cooperated with Castillo and the drug gang in planning the killings. Correspondingly, the Guatemalan government filed a separate indictment against Silva, indicating that Silva acted as the "intellectual author" behind the Guatemalan murders. Specifically, the indictment accuses Silva of planning the murders with Castillo and various gang members at a series of meetings in El Salvador and Guatemala. Those allegations were corroborated during Castillo's trial by an eyewitness witness known as "Judas," currently under government protection in El Salvador.

Silva's experts questioned the legitimacy of the Guatemalan charges, and offered varying theories as to why Guatemala would target Silva specifically. One expert, a journalist named Lafitte Martine Fernandez-Rojas who wrote a popular book about the PARLACEN murders, speculated that Guatemalan officials actually ordered the hit and conspired to prosecute Silva to help ARENA hide the party's connection to drug dealing. Another expert stated his belief that Silva was a "fall guy" used by Guatemalan officials to distance themselves from allegations of drug trafficking.

2

Following this second round of hearings, the IJ issued an oral decision granting Silva asylum but denying Silva withholding of removal or protection under the Convention Against Torture ("CAT"). In so holding, the IJ concluded that the BIA's previous decision left him no choice but to find Silva credible. Upon review, the BIA vacated the IJ's decision and remanded the case again, noting that it had merely instructed the IJ to "provid[e] further explanation," not accept Silva's credibility without question. The BIA also directed the IJ to make a specific determination concerning Silva's eligibility for protection under the CAT if necessary.

D

Following the second remand, the government argued to the IJ that Silva was statutorily barred from seeking asylum or withholding of removal because there were serious reasons to believe Silva committed money laundering in El Salvador and conspiracy to commit murder in Guatemala. The IJ agreed and declared Silva ineligible for asylum and withholding of removal, but sought additional evidence

related to Silva's CAT claim. During this time, the IJ trying Silva's case retired and the case was reassigned to a new judge.[1]

1

In the next round of hearings, Silva's experts testified in support of his CAT claim that he would be tortured or executed in El Salvador because Roberto D'Aubuisson, Jr., a high-powered leader of ARENA and son of the party's founder, would seek retribution for his brother's murder. Silva's experts acknowledged that ARENA no longer controlled the presidency in El Salvador, but insisted that ARENA continues to exert control over many aspects of the government. Silva's experts also argued that Silva would likely not survive being jailed in Guatemala.

2

In March 2013, the IJ issued a decision denying Silva's application for deferral of removal under the CAT and reiterating that he was ineligible for asylum and withholding

---

[1] During this period, Silva also changed counsel multiple times. The attorney representing Silva for the first two rounds of proceedings withdrew after he received anonymous threats subsequent to Silva being granted temporary asylum. Silva's next attorney withdrew after participating in the initial hearings following the second remand, citing a "fail[ure] to cooperate" on Silva's part. Silva claimed she misrepresented her abilities, lied to him, and refused to work because of a fee dispute. A third attorney withdrew after one appearance having learned about the threats to Silva's first attorney, prompting Silva to file a seventeen-page attorney misconduct complaint. A fourth set of attorneys ultimately represented Silva through the remainder of proceedings, partly on a pro bono basis since many of Silva's assets had been frozen by Salvadoran authorities.

of removal. Before issuing his decision, however, the IJ inquired whether Silva wished to reconsider his decision declining to specify a preferred country of removal. Silva indicated he wished to designate Nicaragua as his country of removal. The IJ granted Silva's request, and designated El Salvador as the alternate country of removal.

Considering Silva's claims on the merits, the IJ concluded that Silva was ineligible for asylum and withholding of removal because there were serious reasons for believing he committed serious nonpolitical crimes in both El Salvador and Guatemala. The IJ also found Silva to be non-credible after concluding Silva's explanation for failing to report his violent interactions with police in his asylum application was highly implausible. Additionally, the IJ pointed out that Silva admitted to having lied to the Salvadoran court, and found that Silva failed to produce relevant evidence corroborating his story about the attacks. Finally, the IJ held that Silva had not met his burden under CAT because he had not demonstrated he would likely be tortured in either El Salvador or Guatemala.

3

The BIA thereafter dismissed Silva's appeal, largely adopting the reasoning of the IJ. The BIA agreed that there were serious reasons to believe that Silva was involved in the Guatemalan murders because the charging documents alleged specific facts and were likely the product of a genuine fight against corruption. The BIA also concluded that there were serious reasons to believe Silva committed a serious nonpolitical crime in El Salvador. In so holding, the BIA also upheld the IJ's adverse credibility determination, pointing to Silva's lie to the Salvadoran court, his failure to report

incidents of police violence, and his lack of corroborating evidence. Finally, the BIA upheld the IJ's determination denying Silva's CAT claim.

Silva timely petitioned for review.

## II

"We review 'denials of asylum, withholding of removal, and CAT relief for substantial evidence and will uphold a denial supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Huang v. Holder*, 744 F.3d 1149, 1152 (9th Cir. 2014) (quoting *Garcia-Milian v. Holder*, 755 F.3d 1026, 1031 (9th Cir. 2013)). The agency's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Thus, in order to reverse the BIA, "we must determine that the evidence not only *supports* a contrary conclusion, but *compels* it—and also compels the further conclusion that the petitioner meets the requisite standard for obtaining relief." *Huang*, 744 F.3d at 1031 (alterations and internal quotation marks omitted). "Where, as here, the BIA adopts the IJ's decision while adding its own reasons, this court reviews both decisions." *Vahora v. Holder*, 641 F.3d 1038, 1042 (9th Cir. 2011); *see also Shrestha v. Holder*, 736 F.3d 871, 877 (9th Cir. 2013) (observing that "[w]hen the BIA conducts its own review of the evidence and law rather than adopting the IJ's decision," we review only the BIA's decision "except to the extent that the IJ's opinion is expressly adopted").

III

Silva first argues that the record does not support the BIA's conclusion that there are serious reasons to believe that he participated in the murder of D'Aubuisson and his companions in Guatemala, or engaged in bribery and money laundering in El Salvador. In so arguing, Silva contends that the IJ erred in finding him non-credible.

Because Silva's application for relief was submitted after May 11, 2005, the REAL ID Act governs his case. Pub. L. No. 109-13, 119 Stat. 231 (2005); *see Shrestha v. Holder*, 590 F.3d 1034, 1039 (9th Cir. 2010). The REAL ID Act states in relevant part:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on . . . the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements. . . , the internal consistency of each such statement . . . and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii); *see also id*. §§ 1231(b)(3)(C) (adopting this standard for withholding of removal), 1229a(c)(4)(C) (all other relief). "Under the REAL ID Act, there is no presumption that an applicant for relief is credible, and the IJ is authorized to base an adverse credibility

determination on 'the totality of the circumstances' and 'all relevant factors.'" *Huang v. Holder*, 744 F.3d 1149, 1152–53 (9th Cir. 2014) (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). The Act explicitly names factors such as "the inherent plausibility" of the applicant's account, "consistency between [his] written and oral statements," and the "consistency of such statements with other evidence of record." 8 U.S.C. § 1158(b)(1)(B)(iii). However, "these statutory factors are not exhaustive," and "the agency can look to relevant pre-REAL ID Act factors, such as the 'level of detail of the claimant's testimony.'" *Bingxu Jin v. Holder*, 748 F.3d 959, 964 (9th Cir. 2014) (quoting *Shrestha*, 590 F.3d at 1040). "[O]nly the most extraordinary circumstances will justify overturning an adverse credibility determination." *Id.* (quoting *Shrestha*, 590 F.3d at 1040). Nonetheless, "an adverse credibility determination cannot be based on complete speculation and conjecture." *Singh v. Lynch*, 802 F.3d 972, 977 (9th Cir. 2015). Instead, an IJ must provide "specific and cogent reasons" supporting such a determination with reference to "specific instances in the record." *Shrestha*, 590 F.3d at 1044.

A

In upholding the IJ's decision, the BIA first agreed with the IJ that Silva's failure to mention in his asylum application incidents of police violence that occurred outside the prison and at his home in his asylum application was a significant omission that justified an adverse credibility finding. Silva has pointed us to no evidence that compels a contrary conclusion.

Although it is true that "mere omission of details is insufficient to uphold an adverse credibility finding," *Lai v.*

*Holder*, 773 F.3d 966, 971 (9th Cir. 2014) (quoting *Singh v. Gonzales*, 403 F.3d 1081, 1085 (9th Cir. 2005)), an adverse credibility determination may be supported by omissions that are not "details," but new allegations that tell a "much different—and more compelling—story of persecution than [the] initial application," *Zamanov v. Holder*, 649 F.3d 969, 974 (9th Cir. 2011). For instance, in *Zamanov*, we concluded that substantial evidence supported the BIA's adverse credibility determination where a petitioner's asylum application failed to mention three incidents in which police interrupted his participation in various political activities, arrested him, and beat him. *Id.* at 972. We noted that these omissions "materially altered" his account of persecution by connecting government persecution to his political activity, and thus "went to the core of his alleged fear of political persecution" as our pre-REAL ID act case law required. *Id.* at 973–74.

We have since reiterated the rule explained in *Zamanov* several times. For instance, in *Alvarez-Santos v. INS*, we upheld the BIA's adverse credibility determination where an applicant failed to mention a violent incident supporting his two previous asylum applications. 332 F.3d 1245, 1248–49 (9th Cir. 2003). At the conclusion of his direct testimony, the applicant mentioned for the first time that masked men associated with a guerrilla group who had sent him threatening letters came to his house, caught him, and stabbed him in the shoulder. *Id.* at 1249. We held that it was "simply not believable that an applicant for asylum would fail to remember" the experience of being attacked and stabbed which precipitated his flight from his home country. *Id.* at 1254. Likewise, in *Kin v. Holder*, we held that a petitioner's failure to mention that he had been beaten by police after participating in a political rally constituted substantial

evidence to support an adverse credibility finding, because these allegations were not "trivial details" but allegations "crucial to establishing they were persecuted for their political opinion." 595 F.3d 1050, 1057 (9th Cir. 2010).

Here the BIA reasonably concluded that Silva's failure to mention his altercations with police were not details, but instead "significant events of alleged police misconduct that would have supported his applications for relief." In his asylum application, Silva stated only that the prosecution for corruption in El Salvador aimed at himself and his family was actually a form of persecution for Silva's outspoken criticism of ARENA. At his immigration hearing, however, Silva reported for the first time that police brutally beat him outside his wife's prison and again in his home—incidents which he claims left him with permanent injuries and provoked extreme psychological trauma in his children. Moreover, Silva testified that when he asked the police why they were pointing a gun at his son, they told him it was "because of your political opinion [and] because you're always talking." These are not trivialities, but "pivotal event[s]" that were "crucial to establishing" that Silva actually suffered persecution as a result of his political opinion. *See Alvarez-Santos*, 332 F.3d at 1254; *Kin*, 595 F. 3d at 1057.

Likewise, Silva's explanation for omitting these events from his application for asylum "is not persuasive enough to compel the conclusion that the omissions were immaterial." *Kin*, 595 F.3d at 1057. Before testifying about the altercation with police outside his wife's prison, Silva explained that such incident was not included in his asylum application because he "forgot" to mention it to his attorney. Silva later stated that he did not previously report his altercations with police because "[his] problem is very complex" and because

he worried other Salvadoran detainees might beat him and "steal [his] declaration." Yet as the IJ and the BIA both concluded, it is "simply not believable" that Silva would fail to remember such "dramatic incident[s]" so closely related to his asylum claim. *See Alvarez-Santos*, 332 F.3d at 1254. We also agree with the agency that it strains belief to conclude that Silva would fear accusing unnamed police officers of misconduct when his initial asylum application accused ARENA's highest ranking officials of wrongdoing and corruption. Such circumstances clearly distinguish Silva's case from instances in which we have found the BIA's credibility determination based on an omission to be unsupported. *See Lai*, 733 F.3d at 974 (holding an adverse credibility determination was not supported where a claimant "gave a plausible and compelling explanation for the omission").

Silva argues that various documents submitted several years after his testimony compel the conclusion that the agency's credibility determination is mistaken. But as the BIA noted, many of these documents were based only on Silva's own assertions or otherwise insufficient to corroborate his version of events. For instance, Silva submitted an evaluation from a psychologist who examined him more than four years after his alleged encounters with police, and whose findings were based entirely on Silva's own account of past events. Likewise, the reports Silva submitted from two physicians indicate only that Silva was seen for chest pain and various other conditions roughly two years after the violent incidents with police are said to have occurred. Silva also points to a statement attributed to his driver which supports his claims that he was beaten outside his wife's prison. Yet the BIA found this report inconsistent with statements by Silva's brother that Silva was always

accompanied by bodyguards, and also pointed to Silva's failure to provide any corroborating evidence from his son whom police allegedly threatened—now aged 16 or 17—despite the fact that several other family members testified on Silva's behalf. Because the record does not compel the conclusion that the agency's assessment of this evidence was mistaken or that "such corroborating evidence [was] unavailable," we decline to reverse the IJ's credibility determination on this basis. *See* 8 U.S.C. 1252(b)(4); *see also Shrestha*, 590 F.3d at 1047–48.

B

In addition to Silva's failure to report incidents of alleged persecution by the police, the IJ and the BIA also noted discrepancies in Silva's testimony regarding his entry date into the United States. In his asylum application, Silva said he left El Salvador on January 7, 2007, and that he arrived in the United States on February 1, 2007. However, after the government's attorney pointed out that this exit date was irreconcilable with Silva's reported timeline in traveling to the United States, Silva then stated he actually left El Salvador on January 22, 2007.

Silva argues that this date discrepancy is insufficient on its own to support an adverse credibility determination, as the BIA concluded on its first remand. We are inclined to agree. However, "when inconsistencies that weaken a claim for asylum are accompanied by other indications of dishonesty . . . an adverse credibility determination may be supported by substantial evidence." *Kaur v. Gonzales*, 418 F.3d 1061, 1067 (9th Cir. 2005). Here, the IJ and the BIA clarified that Silva's varying testimony on this point was significant not for

its own sake, but instead because it related directly to Silva's efforts to avoid criminal charges.

The record demonstrates that following the legislature's revocation of Silva's immunity, a Salvadoran court held hearings beginning on January 18, 2007, to determine whether a warrant for Silva's arrest ought to be issued. Silva testified that he instructed his attorneys to submit a note to the judge stating that he was too ill to attend the proceedings because of the beating he sustained by police when they searched his home. When DHS pointed out that Silva had previously testified that this incident took place roughly three months before the court hearings, Silva claimed that he had been beaten an additional time by individuals dressed as police in January 2007. The government then asked Silva to explain how he was both too injured to attend the arrest-warrant hearings but well enough to flee El Salvador on January 22 as he had just indicated. Silva first responded by saying he was "just hurt" and "not totally in a grave state." After the government lawyer repeated the question multiple times, however, Silva admitted that he planned to and did flee El Salvador on January 22, and that his statement to the court that he was too ill to attend was fraudulent. We have held on numerous occasions that the "[a]dmission of prior dishonesty can support an adverse credibility determination." *Don v. Gonzales*, 476 F.3d 738, 741 n.5 (9th Cir. 2007); *see also Kaur*, 418 F.3d at 1065 ("It strains credulity to hold that the evidence presented at the asylum hearing compels us to find Kaur believable for the sole reason that she admitted to being a liar."). The IJ did not err in finding Silva non-credible on a such basis here.

In his opening brief, Silva's attorney admits that Silva intentionally lied to the Salvadoran court, but contends that

the lie was justified "to escape a sham trial at a puppet court." But the record does not compel that conclusion. Although some of Silva's experts asserted that it is "virtually impossible to get a fair trial in El Salvador," they also recognized that justice can be had—an assertion further supported by the fact that Silva's mother-in-law was acquitted of all charges against her, and his wife acquitted of several. Moreover, Silva's appeal to possible corruption in the Salvadoran justice system does nothing to explain why Silva testified to the IJ that he was too sick to attend the hearings until inconsistencies in his own testimony forced him to admit he was lying. *See Don*, 476 F.3d at 742 (observing that a petitioner's argument that he lied to Sri Lankan police out of fear for his safety "d[id] not explain why Don provided different dates to the asylum officer and to the IJ"). The agency's credibility determination was valid.

## IV

Silva next argues that the BIA erred in concluding that there are serious reasons to believe that he committed two serious nonpolitical crimes—conspiracy to murder D'Aubuisson and his companions in Guatemala and money laundering and bribery in El Salvador. Once again, we review the BIA's conclusion for substantial evidence. *See Go v. Holder*, 640 F.3d 1047, 1052 (9th Cir. 2011).

## A

An individual is ineligible for asylum and withholding of removal where "there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States." 8 U.S.C. §§ 1158(b)(2)(A)(iii) (asylum), 1231(b)(3)(B)(iii) (withholding of removal); *see also* 8 C.F.R.

§ 1208.16(d)(2). We have interpreted "serious reasons for believing" as "tantamount to probable cause." *Go*, 640 F.3d at 1052; *see also Matter of E-A-*, 26 I. & N. Dec. 1, 3 (BIA 2012).

In finding Silva ineligible for asylum and withholding of removal, the BIA determined that there are serious reasons for believing that Silva conspired with others to murder D'Aubuisson and the other PARLACEN delegates in Guatemala. Silva does not contest that the Guatemalan murders were serious nonpolitical crimes, nor did he make any such argument to the BIA. Thus, the only question before us in relation to this issue is whether there are "serious reasons for believing" Silva was complicit in these killings. *See* 8 U.S.C. § 1252(a)(1); *Abebe v. Mukasey*, 554 F.3d 1203, 1208 (9th Cir. 2009) (en banc) (noting that a " [p]etitioner will . . . be deemed to have exhausted only those issues he raised and argued in his brief before the BIA.").

As both the IJ and the BIA noted, the Guatemalan indictment provides strong reason to believe that Silva was involved in the PARLACEN murders, not least because it alleges specific facts connecting Silva to the crime. The indictment accuses Silva of planning the murders with Castillo's gang contacts at a series of meetings—one inside a restaurant allegedly owned by Osorto, the mayor who was convicted of corruption for assisting Silva in obtaining government contracts, and a second meeting at a car wash in Guatemala. Moreover, the indictment's allegations were corroborated by "Judas," an eyewitness whom the Guatemalan court deemed credible. Judas testified in no uncertain terms that he witnessed Silva meet with various gang members, and that Silva planned the murder of D'Aubuisson and his companions at those meetings. What is

more, Judas asserted that the murders were occasioned by Silva's desire for political and financial revenge against ARENA—the same theory that supported the Guatemalan government's conviction of Castillo for ordering the killings. Such evidence is certainly sufficient to constitute probable cause—a "fair probability" that Silva was involved in the murders. *See United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 246 (1983)).

Silva argues that the probable cause standard we articulated in *Go* is inapposite because unlike the petitioner in that case, Silva did not affirmatively admit to participating in the murders. *See Go*, 640 F.3d at 1053. But there is no question that *Go*'s standard can be met without an explicit admission of guilt, as other courts have rightly recognized.

For instance, in *Khouzam v. Holder*, 361 F.3d 161, 166 (2d Cir. 2004), the Second Circuit relied on an Egyptian arrest warrant and police reports to conclude that there were "serious reasons for believing" that a petitioner had committed a murder in that country. In so concluding, the court reasoned that, just as in Silva's case, the documents submitted were sufficient to establish probable cause because they suggested a possible motive for the killing and offered specific allegations supporting the charge—that the petitioner's fingerprints were found at the scene, that he was seen wearing a bloody shirt that was later recovered, and that eyewitnesses said he had an injured hand. *Id.* Silva contends that *Khouzam* is distinguishable because the charges in that case were supported by circumstantial evidence rather than eyewitness testimony. But that difference is beside the point. Even assuming that the quantum of evidence in Silva's case differs from the evidence at issue in *Kouzam*, Silva has

pointed to no evidence that "compel[s] the conclusion that probable cause was lacking." *Go*, 640 F.3d at 1053. Absent such a showing, the BIA's determination must be upheld.

Silva also argues that the IJ improperly ignored the testimony of Fernandez-Rojas and Silva's other experts that the charges against Silva were pretextual and that the PARLACEN murders were in fact perpetrated by the Guatemalan government to cover up drug dealing. But the agency was within its discretion to reject these alternate theories. *See Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 n.7 (9th Cir. 2010) (observing that an IJ is "not required to adopt as true all of the facts" upon which an expert witness based his opinion where the IJ states "specific reasons in the record why the testimony was insufficient to establish" facts necessary to grant relief).

Here, both the BIA and the IJ found that evidence in the record suggests that although there is corruption in Guatemala, there have been improvements especially related to that government's investigation of the PARLACEN murders, making it unlikely that the charges against Silva were pretextual. For instance, the BIA noted that in response to the murder of the police officers who carried out the PARLACEN killings, the Guatemalan government sought the assistance of the FBI to help bring those responsible to justice. Moreover, the record demonstrates that Guatemala has convicted not only numerous gang members implicated in the murders, but also Manuel Castillo, himself a Guatemalan official. Likewise, the BIA observed that the reliability of the CICIG report upon which Silva's experts based their conclusions was at least questionable since the report's principal author has herself since been implicated in corruption and stripped of immunity by CICIG. One may

certainly disagree with the agency's assessment of the evidence or believe such evidence "cast[s] a reasonable doubt on [Silva's] guilt." *Khouzam*, 361 F.3d at 166. But that is a far cry from "compel[ling] a finding that [Silva] was framed" or that probable cause is lacking. *Id.*

Because the Guatemalan charges provide a sufficient basis upon which to conclude that Silva is ineligible for asylum and withholding of removal, we need not reach Silva's challenges to the BIA's alternate conclusion that there are serious reasons for believing that Silva committed a second serious nonpolitical crime by engaging in bribery and money laundering in El Salvador. Silva is ineligible for asylum and withholding of removal.

B

Silva next argues that even assuming his possible involvement in the Guatemalan murders renders him ineligible for asylum and withholding of removal, the agency should have been forbidden from reaching this conclusion under the law of the case doctrine.

The law of the case doctrine "generally preclude[s] [courts] from reconsidering an issue previously decided by the same court, or a higher court in the identical case." *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990). However, we have previously observed that "it is doubtful that federal courts have the authority to extend the law of the case doctrine" to administrative proceedings. *Lockert v. U.S. Dep't of Labor*, 867 F.2d 513, 518 (9th Cir. 1989); *see also Biltmore Forest Broadcasting FM, Inc. v. FCC*, 321 F.3d 155, 163 (D.C. Cir. 2003) (noting that "the law of the case doctrine is of uncertain force in the

context of administrative litigation"); *but see Stacy v. Colvin*, No. 13-36025, 2016 WL 3165597, at *1 (9th Cir. June 7, 2016) — F.3d — (holding that the law of the case doctrine applies to social security administrative remands from federal court). That reticence makes sense in the context of immigration proceedings, because both the BIA and the IJ have explicit legal authority to reconsider their own decisions *sua sponte*. *See* 8 C.F.R. § 1003.2(a) ("The Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision."); 8 C.F.R. § 1003.23(b)(1) ("An Immigration Judge may upon his or her own motion at any time . . . reopen or reconsider any case in which he or she has made a decision, unless jurisdiction is vested with the Board."). Indeed, we are aware of only one circuit that has held that the law of the case doctrine applies to immigration proceedings. *See Zhang v. Gonzales*, 434 F.3d 993, 998 (7th Cir. 2006) (interpreting the law of the case doctrine as forbidding a new IJ from reconsidering a petitioner's credibility where that issue exceeded the scope of the BIA's instructions on remand). For the purposes of this appeal, however, we need not decide whether the law of the case doctrine applies in the immigration context, because even assuming it does, the doctrine provides no help to Silva.

For the law of the case doctrine to bar reconsideration of an issue, "the issue in question must have been decided explicitly or by necessary implication in the previous disposition." *United States v. Lummi Indian Tribe*, 763 F.3d 1180, 1187 (9th Cir. 2014) (quoting *United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000)). Silva admits that neither the IJ nor the BIA explicitly decided whether he was ineligible for asylum and withholding of removal on the basis of the serious nonpolitical crimes bar before the final round of decisions. Nonetheless, he argues

that the IJ and the BIA "found by necessary implication" in their earlier decisions that the bar did not apply. We disagree.

In its first decision, the IJ denied Silva asylum and withholding of removal on the basis of its adverse credibility determination. The BIA reversed and remanded, stating that the IJ's focus on the discrepancies in dates relating to Silva's departure from El Salvador was inadequate to sustain the credibility determination. Subsequently, the IJ issued a second decision granting Silva asylum, based in large part on his erroneous view that the BIA's previous ruling required that he find Silva credible. We doubt that this decision held by "necessary implication" that the serious nonpolitical crimes bar did not apply, since we find no evidence that the IJ was ever presented with or actually considered that issue. *See Lummi Nation*, 763 F.3d at (noting that "law of the case acts as a bar only when the issue in question was actually considered and decided by the first court" (quoting *United Steelworkers of Am. v. Ret. Income Plan for Hourly-Rated Employees of ASARCO, Inc.*, 512 F.3d 555, 564 (9th Cir. 2008))); *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012) (holding that an issue was not decided by necessary implication where it "had never been considered or decided by any court"); *see also* Black's Law Dictionary (9th ed. 2009) (defining "necessary implication" as "[a]n implication so strong in its probability that anything to the contrary would be unreasonable"). Yet even assuming the IJ's second decision addressed the serious nonpolitical crimes bar by "necessary implication" insofar as it granted Silva asylum, the BIA reversed the IJ's decision and once more remanded the case. Moreover, nowhere in BIA's second decision do we find any indication that it considered and rejected the applicability of the bar, or that it granted any form of relief suggesting the bar did not apply. To the

contrary, the BIA's decision returned the matter to the IJ with explicit instructions to conduct further inquiry to determine whether Silva was actually entitled to asylum or any other form of relief.  Silva's law of the case argument is meritless.

V

Although Silva is ineligible for asylum and withholding of removal under 8 U.S.C. §§ 1158(b)(2)(A)(iii) and 1231(b)(3)(B)(iii), he may still seek deferral of removal under the CAT.  *See* 8 C.F.R. § 1208.17(a); *see also Go*, 640 F.3d at 1053.  To succeed in obtaining such relief, a petitioner must establish that "it is more likely than not that he or she would be tortured if removed to *the* proposed country of removal." 8 C.F.R. § 1208.16(c)(2) (emphasis added); *see also* 8 C.F.R. § 1208.17(a) (applying this standard to deferral of removal).  Such language plainly requires that a petitioner must demonstrate he will likely suffer torture in the country to which he is *actually* ordered removed "as opposed to an alternative country of removal." *She v. Holder*, 629 F.3d 958, 965 (9th Cir. 2010) (examining identical language as contained in 8 C.F.R. § 1208.16(b)); *see also* 8 C.F.R. § 1240.10(f) (contrasting the IJ's power to designate "*the* country of removal" with the IJ's ability to identify multiple "alternative *countries* of removal") (emphasis added).

At his initial immigration hearing, Silva decided not to designate a country of removal, prompting the IJ initially assigned to Silva's case to designate El Salvador as the country of removal in accordance with the relevant statute. *See* 8 U.S.C. § 1231(b)(2) (establishing the process for determining the country to which an alien who has been residing in the United States shall be removed). Subsequently, that IJ retired, and a new IJ took over Silva's

case and conducted hearings on Silva's CAT claim. At the conclusion of these hearings, this IJ inquired on his own initiative whether Silva wished to reconsider his decision to forego designating a country of removal. After consulting with counsel, Silva requested that Nicaragua be designated as his country of removal. The IJ obliged, and ultimately ordered that Silva be removed to Nicaragua as the primary country of removal, or alternatively to El Salvador.

Silva appealed the IJ's decision to the BIA and contested the IJ's determination that he failed to meet his burden under CAT. However, Silva's arguments focused exclusively on the likelihood that he will suffer torture in either El Salvador or Guatemala. At no point did Silva argue to the BIA, nor has he argued to us, that he would likely suffer torture if removed to Nicaragua—"*the* proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Because this issue is unexhausted, we have no power to review it. *See* 8 U.S.C. § 1252(d)(1); *Abebe v. Mukasey*, 554 F.3d 1203, 1208 (9th Cir. 2009) (en banc) (holding that an alien is "deemed to have exhausted only those issues he raised and argued in his brief before the BIA"); *see also Pagayon v. Holder*, 675 F.3d 1182, 1188 (9th Cir. 2011) ("A petitioner must specify the issues he intends to raise on appeal; a 'general challenge to the IJ's decision' will not suffice.'" (quoting *Zara v. Ashcroft*, 383 F.3d 927, 930 (9th Cir. 2004))). The BIA's order commanding Silva's removal to Nicaragua stands.[2]

---

[2] We note that Silva also challenges the BIA's determination that he has not demonstrated a likelihood that he would be tortured in El Salvador, the alternate country of removal. Because this challenge does not relate to "the proposed country of removal," which is properly the focus of Silva's CAT claim, we do not review it at this time. *See* 8 C.F.R. § 1208.16(c)(2); *She*, 629 F.3d at 965 n.7. However, should El Salvador ultimately become the proposed country of removal, *see* 8 U.S.C. § 1231(b)(2)(C), we fully

## VI

For the foregoing reasons, the petition for review is

**DENIED**.

---

expect that the BIA will grant a motion to reopen Silva's application such that we may consider his challenge to this aspect of the BIA's determination. *Cf. She*, 629 F.3d at 965.