Sameh Sami S. KHOUZAM, a/k/a Sameh Sami Khouzam, a/k/a Sameh S. Khouzam, a/k/a Sameh Khouzam, Petitioner,

v.

John ASHCROFT, Attorney General of the United States, Respondent.

Docket Nos. 02–4109, 02–4159.

United States Court of Appeals, Second Circuit.

Argued Oct. 2, 2003.

Decided Feb. 24, 2004.

Amended April 12, 2004.

Matthew L. Guadagno, New York, New York (Kerry W. Bretz, Jules E. Coven, Bretz & Coven, LLP, New York, New York, of counsel; Guy Menahem, Law Student, assisted on the brief), for Petitioner.

Michael M. Krauss, Assistant United States Attorney, New York, New York (James B. Comey, United States Attorney, Kathy S. Marks, Meredith E. Kotler, Assistant United States Attorneys for the Southern District of New York, New York, New York, of counsel), for Respondent.

Before: CARDAMONE, MINER, and CALABRESI, Circuit Judges.

CARDAMONE, Circuit Judge.

Petitioner Sameh Sami S. Khouzam, an alien, has petitioned us for review of two final orders—one dated March 7, 2002, the other dated May 7, 2002—of the Board of Immigration Appeals (BIA or Board), both denying him relief from deportation. The issue we deal with on the second petition concerns the subject of torture.

Torture has been employed as an infamous instrument to extract confessions from or determine the guilt or innocence of an accused from ancient days in Greece and Rome. Its use is an inherently flawed practice, antithetical to basic notions of liberty, and prohibited by the U.N. Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85(CAT). Its practice is associated with some of the darkest moments in human history, from the medieval inquisitions to the horrors of 20th century totalitarianism. *See generally* Matthew Lippman, *The Development and Drafting of the United Nations Convention Against Torture and Other Cruel,*

*Inhuman or Degrading Treatment or Punishment,* 17 B.C. Int'l & Comp. L.Rev. 275, 275–96 (1994). Its critics have ranged from Cicero in ancient Rome to Blackstone and Beccaria in early modern Europe to Solzhenitsyn in the Soviet Union. *See id.;* 4 William Blackstone, Commentaries *321 (Univ. Chicago Press 1979) (1769).

Article 3 of the CAT flatly prohibits any individual from being deported to a country where there are substantial grounds to believe the individual would be in danger of being tortured. Further, this Court long ago expressed concern about handing individuals over to would-be torturers. *See, e.g., Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir.1960). The United States became a party to the CAT in 1994, and promulgated its first regulations implementing Article 3 in 1999. *See* Regulations Concerning the Convention Against Torture, 64 Fed.Reg. 8478 (1999).

The basic question at issue in the second petition is what constitutes torture. Having first determined that Khouzam is more likely than not to be tortured in Egypt, the Board of Immigration Appeals later in May 2002 changed its mind. Relying in part on a recent opinion of the U.S. Attorney General, the Board held that the abuse Khouzam will likely face from Egyptian police does not amount to torture because the police will not be acting with the consent or approval of authoritative government officials. It also apparently believes that since Khouzam stands accused of a crime in Egypt, any cruel acts perpetrated against him would not constitute torture, but would be a lawful sanction.

International declarations and treaties perhaps cannot reform human nature, but we are firmly persuaded that the provisions of the CAT have been shamefully trampled upon by Egyptian police and, in addition, that U.S. immigration officials have decided this case contrary to the commands of Article 3 of the CAT. Accordingly, we grant Khouzam's second petition for review, and vacate the Board's May 7, 2002 decision.

## BACKGROUND

### A. *Facts*

On the night of February 10, 1998 Khouzam boarded a flight from Egypt to the United States. While he was en route, the Egyptian authorities notified the U.S. State Department that Khouzam was wanted in Egypt allegedly for having committed a murder there just hours before his departure. Based on this information U.S. officials thereupon cancelled petitioner's visa and detained him upon arrival. Khouzam, who is a Coptic Christian Egyptian, promptly applied for asylum and withholding of removal under the Immigration and Nationality Act (INA), asserting he feared he would be persecuted on account of his religion were he returned to Egypt. This sequence of events spawned the two petitions for review that are now before us.

### B. *Prior Administrative Proceedings*

#### 1. *First Petition*

On May 4, 1998 an immigration judge (IJ) considered Khouzam's application for asylum and withholding of removal. Under the INA no person may be granted such relief if there are "serious reasons" to believe that person has committed a "serious nonpolitical crime" prior to arriving in the United States. *See* 8 U.S.C. §§ 1158(b)(2)(A)(iii), 1231(b)(3)(B)(iii) (2000). Having found this to be the case based on evidence of the alleged murder, the immigration judge denied Khouzam's application and ordered his removal from the United States. On January 4, 1999 the Board of Immigration Appeals dismissed Khouzam's appeal. Subsequently, for rea-

sons that we need not go into here, there was a new hearing before an IJ, who again denied Khouzam's asylum and withholding claims. On March 7, 2002 the appeal from this decision was also dismissed. This subsequent dismissal is the subject of Khouzam's first petition.

### 2. *Second Petition*

At the time when the administrative proceedings related to the first petition were taking place, Congress instructed the Attorney General to implement Article 3 of the Convention Against Torture, which prohibits the deportation of any person to a state where there are substantial grounds to believe the person would be subjected to torture. *See* Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. 105–277, Div. G, Title XXII, § 2242, 112 Stat. 2681–822, 8 U.S.C. § 1231 note (2000). Unlike asylum and withholding of removal under the INA, evidence of a past crime is not a bar to deferral of removal under the CAT. Once the CAT's implementing regulations were adopted, Khouzam applied for this new form of relief. On January 14, 2000, after three days of hearings, an immigration judge found it more likely than not that Khouzam would be tortured in Egypt. The administrative judge therefore granted Khouzam deferral of removal. The INS appealed this decision to the Board of Immigration Appeals. The Board dismissed the INS' appeal on July 24, 2000.

On April 5, 2002 the INS moved the BIA to reconsider its July 24, 2000 decision granting Khouzam deferral of removal under the CAT. Without making any new findings of fact—and relying instead on a purported change in the law—on May 7, 2002 the BIA reconsidered and vacated its earlier decision and ordered that Khouzam be removed from the United States. It is this decision that is the subject of Khouzam's second petition.

## DISCUSSION

Each of the two petitions before us raises a distinct set of issues. The first petition requires us to determine whether the BIA erred in concluding that Khouzam is barred from asylum and withholding of removal as a result of evidence that he allegedly committed a murder in Egypt. The second requires us to determine whether the BIA erred in reconsidering and vacating its previous decision, which had ruled Khouzam was entitled to relief under the CAT.

### I Standard of Review

For each claim we must decide initially whether the BIA used the correct legal standard and, if it did, whether it applied that standard correctly. The question of the legal standard hinges on a *Chevron* analysis of the relevant statutes. *See INS v. Aguirre–Aguirre*, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The first question is whether Congress itself specified the standard. *See Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. If Congress clearly established the standard, then we review the BIA's interpretation of that standard *de novo*. *See id.* at 842–43 & n. 9, 104 S.Ct. 2778. But if the statute is silent or ambiguous with respect to the precise standard, we must defer to the Attorney General's construction of it, so long as that construction is reasonable. *See id.* at 843–44, 104 S.Ct. 2778. Further, since the Attorney General has delegated adjudicatory authority to the BIA, we accord the same level of deference to the BIA's view of what the proper legal stan-

dard is. *See Aguirre–Aguirre*, 526 U.S. at 425, 119 S.Ct. 1439.

We note that the Department of Homeland Security has also been given a role in administering the INA and the CAT under the Homeland Security Act of 2002, Pub.L. No. 107–296, § 1102, 116 Stat. 2135, 2273–74 (codified at 8 U.S.C. § 1103 (West Supp.2003)), *as amended by* Pub.L. No. 108–7, § 105, 117 Stat. 11, 531 (2003). The Attorney General, however, has retained authority over the Executive Office for Immigration Review and thus authority over the BIA, and has the final say (in relation to the Department of Homeland Security) on all questions of law. *See id.* For the purpose of resolving the questions raised in Khouzam's case, we need only concern ourselves therefore with the Attorney General's and BIA's constructions of the relevant statutes.

■ Assuming the BIA identified the right legal standard, we must next determine whether it applied that standard correctly. To this end, we ask whether the BIA's findings of fact are supported by substantial evidence, reversing factual findings only when the evidence would compel a reasonable fact-finder to reach a contrary conclusion to that reached by the Board of Immigration Appeals. *See* 8 U.S.C. § 1252(b)(4)(B) (2000); *Melgar de Torres v. Reno*, 191 F.3d 307, 312–13 (2d Cir.1999). The BIA's application of law to undisputed facts is reviewed *de novo. See Diallo v. INS*, 232 F.3d 279, 287 (2d Cir. 2000). The Board's decision to reconsider one of its own previous decisions is reviewed under the abuse of discretion standard. *See Brice v. U.S. Dep't of Justice*, 806 F.2d 415, 419 (2d Cir.1986); *see also Iavorski v. INS*, 232 F.3d 124, 128 (2d Cir.2000) (applying abuse of discretion standard to the BIA's decision on a motion to reopen).

## II Asylum and Withholding Claims

With these standards of review in mind, we turn to Khouzam's first petition. In that petition, petitioner asserts the BIA erroneously denied him asylum and withholding of removal based on the fact that it had serious reasons to believe he had committed a serious nonpolitical crime prior to arriving in the United States. Khouzam does not dispute that the INA would bar him from relief if this standard was met. Nor does he dispute that the alleged murder constitutes a serious nonpolitical crime. Instead, Khouzam insists there are no serious reasons to believe that this murder was ever committed, especially not by him.

### A. The "Serious Reasons" Standard

■ Khouzam maintains the BIA applied the wrong standard in assessing whether the evidence created serious reasons to believe that he had committed the murder. It is his contention that the meaning of the phrase serious reasons is the same as that of probable cause, and that the BIA applied a lower standard in his case. We agree with his first point, but not his second.

As to the first point, this Court interpreted the phrase serious reasons to mean probable cause in *Sindona v. Grant*, 619 F.2d 167, 174 (2d Cir.1980), and the Ninth Circuit followed suit in *McMullen v. INS*, 788 F.2d 591, 598–99 (9th Cir.1986). Although there might be room to argue that *Chevron* gives the Attorney General discretion to construe serious reasons as a standard higher than probable cause, it clearly could not be a lower standard. In any event, the Attorney General has already construed the phrase in accordance with *Sindona* and *McMullen. See Deportation Proceedings for Doherty*, 13 U.S. Op. Off. Legal Counsel 1, *24, 1989 WL 595832 (1989).

Equating serious reasons with probable cause, however, does not help petitioner's case. Although neither the immigration judge nor the BIA used the phrase probable cause in their opinions in this case, it is abundantly clear that the standard they applied was equivalent to, if not higher than, probable cause. The immigration judge stated that the alleged murder was proved by "convincing evidence . . ., not necessarily proof beyond any doubt, but certainly very strong proof and sufficient." He went on to state that the evidence tended to show that Khouzam committed the murder, and that "the bulk of the evidence on this point strongly support[ed] [that] theory." The BIA then affirmed this "well-reasoned decision" with only minor comments.

### B. Evidence Supporting the Decision

■ The immigration judge relied on documents describing an Egyptian police investigation into the death of one Zaki Mohammed Youssef. These documents—that included Egyptian police reports and a warrant for Khouzam's arrest—indicate Khouzam's fingerprints were found at the crime scene, and that he was seen with an injured hand and a bloody shirt on the night of the murder. Further, they relate that the police later recovered the bloody shirt, and the blood on it matched the victim's blood type. They also suggest a possible motive for the killing. In addition to this documentary evidence, the immigration judge noted that Khouzam had arrived in the United States one day after the alleged murder with an injured hand. When asked about his injury, he told the INS that a woman had attacked him with a vase, they had fought, she had fallen, and he had run. The judge observed that Khouzam's injured hand and his story are consistent with his having committed the murder.

Khouzam maintains that none of the documents received from Egypt are reliable because he was framed by the Egyptian police. He offered the testimony of two expert witnesses, one of whom pointed to irregularities in the police reports. The other expert described persecution of Coptic Christians in Egypt, and opined that a number of Copts have been wrongfully accused of crimes. Khouzam also offered a letter from a friend in Egypt stating that the alleged victim had not been killed, and enclosing photographs to prove that she was alive. The photographs, however, were of an unrecognizable veiled woman.

Petitioner also declares that the U.S. government passed information from his confidential asylum application to the Egyptian government. This assertion does not detract from the evidence that Khouzam allegedly committed a murder, which, if credited, would bar him from asylum and withholding. While we requested further briefing from the parties on this matter because of its potential effect on Khouzam's CAT claim, our decision on that claim renders it irrelevant there as well.

While petitioner's evidence might cast a reasonable doubt on his guilt, it does not compel a finding that he was framed. Absent such a finding, we agree with the immigration judge that there were serious reasons to believe that Khouzam committed the murder. We therefore deny Khouzam's petition for review of the BIA's asylum and withholding decision.

### III   Convention Against Torture Claim

Analysis turns next to Khouzam's second petition. It seeks review of the BIA's May 7, 2002 decision to reconsider and vacate a prior decision granting Khouzam CAT relief. Before we reach the merits of that decision two threshold matters must be addressed.

## A. *Khouzam's Motion to Reconsider*

First, we observe that after Khouzam petitioned this Court to review the BIA's May 7, 2002 CAT decision, he then filed a motion with the BIA asking it to reconsider that May 2002 decision. On July 8, 2002 the BIA denied the motion and clarified the reasoning behind its May 7, 2002 decision. Khouzam, however, did not petition this Court to review the July 8, 2002 decision, and we became aware of it only when the U.S. Attorney's office transmitted it to us on October 1, 2003, one day before oral argument was to take place. At oral argument, we therefore requested that the parties submit additional briefs on the BIA's jurisdiction to decide a motion to reconsider after a petition for review has been filed in this Court, and on the effect of such a motion on our review of the initial decision.

■ In light of *Stone v. INS*, 514 U.S. 386, 394, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995), and 8 U.S.C. § 1252(b)(6) (2000), we are satisfied that: (1) the BIA unquestionably had jurisdiction to reconsider its initial decision even after Khouzam had filed his petition for review with this Court, and (2) this Court still has jurisdiction to review the initial May 2002 decision, even after the BIA's denial of the motion to reconsider it. Although § 1252(b)(6) would have allowed Khouzam to petition us to review the July 8, 2002 decision along with the May 7, 2002 decision, it does not require him to follow that course. The government suggests we take judicial notice of the July 8, 2002 decision, and in particular that decision's clarification of the reasoning behind the May 7, 2002 decision. We see no reason to do this since it is only the May 7, 2002 decision that we are reviewing. If the BIA had wanted to amend its May 7, 2002 decision, it could have done so by granting the motion to reconsider. In any event, we

realize that while the July 8, 2002 decision may be a helpful clarification, it does not essentially add anything that we did not already assume to be implicit in the May 7, 2002 decision.

## B. *The Parties' Stipulation*

■■ The second threshold matter we pass upon is that on October 14, 2003 the parties agreed to a proposed order under which this Court would vacate the BIA's May 2002 CAT decision and dismiss Khouzam's petition with respect to that decision. Although the parties are free to agree to a dismissal on their own, Federal Rule of Appellate Procedure 42(b) does not mandate that an appellate court issue an order simply because the parties agree to it. Action by the court is not a subject that the parties may negotiate among themselves, and a judicial act, such as a dismissal of a petition, is normally taken only when the appellate court determines that such action is warranted on the merits. *See Clarendon Ltd. v. Nu–West Indus., Inc.*, 936 F.2d 127, 129 (3d Cir.1991).[1] In the context of appeals from a district court judgment, even where a settlement causes mootness, vacatur of the district court judgment may be granted only in "exceptional circumstances," and not simply because it is provided for in the settlement agreement. *See U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994); *Microsoft Corp. v. Bristol Tech., Inc.*, 250 F.3d 152, 154 (2d Cir.2001) (per curiam).

In the case of Khouzam's petition for review, the parties' agreement does not even cause the petition to become moot. An agency has decided that Khouzam is ineligible for CAT relief, and Khouzam has agreed to withdraw his petition *if* that decision is vacated. The U.S. Attorney's office does not contend that it has the authority to vacate this decision itself. Nor does it assert—since the Department

---

1. Under the Civil Appeals Management Plan (CAMP), this Court does routinely vacate BIA decisions and remand for further consideration by the BIA when the parties agree to such orders prior to oral argument. In the

of Homeland Security's Directorate of Border and Transportation Security has assumed the enforcement functions formerly carried out by the Immigration and Naturalization Service, *see* Homeland Security Act of 2002, Pub.L. No. 107–296, § 441, 116 Stat. 2135, 2192, 6 U.S.C. § 251 (West Supp.2003)—that the U.S. Attorney has the authority to stop the Department of Homeland Security from enforcing the decision. So while the U.S. Attorney has agreed to an order from this Court vacating the BIA's decision, whether or not we issue that order will still determine whether or not Khouzam may be deported to Egypt.

Moreover, we are troubled by the government's tactics here. Khouzam's CAT petition has been fully litigated by both sides. At oral argument, we expressed doubts as to the soundness of the Attorney General's definition of torture in *Matter of Y–L–, A–G–, R–S–R–,* 23 I. & N. Dec. 270, 285, 2002 WL 358818 (A.G.2002). In addition to being dispositive in Khouzam's case, this is clearly an issue of public importance. For the government to agree to a vacatur two weeks *after* oral argument suggests that it is trying to avoid having this Court rule on that issue. We therefore decline to grant the order that the parties have agreed to. Instead, we will review Khouzam's CAT petition and grant or deny it according to its merits.[2]

### C. *The BIA's May 7, 2002 CAT Decision*

■ The Senate voted to ratify the CAT in 1990, subject to a number of conditions,

*see* 136 Cong. Rec. 36,198 (1990), and in 1998 Congress directed the Attorney General to implement Article 3 of the CAT "subject to any reservations, understandings, declarations, and provisos contained in the ... Senate resolution of ratification." Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. 105–277, Div. G, Title XXII, § 2242, 112 Stat. 2681–822, 8 U.S.C. § 1231 note (2000).

Article 3 of the CAT expressly prohibits the United States from returning any person to a country in which it is more likely than not that he or she "would be in danger of being subjected to torture." (While the CAT uses the phrase "substantial grounds for believing" rather than "more likely than not," the Senate voted to ratify the CAT with the understanding that the more likely than not standard would be used, *see* 136 Cong. Rec. 36,198 (1990), and that standard is not disputed here.) As is pertinent to this case, the CAT defines torture as

> any act by which severe pain or suffering ... is intentionally inflicted on a person for such purposes as obtaining from him ... information or a confession ... when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

---

case at bar, the parties did not agree to vacatur until after oral argument, and our present holding in not intended to call into question the pre-oral argument CAMP practice.

**2.** As a third threshold issue, Khouzam insists that the BIA erred in reconsidering its July 24, 2000 decision after the INS filed its motion to reconsider outside of the 30–day deadline for such motions. Although the government disputes that its motion was untimely,

the issue may well be irrelevant because of the BIA's authority to reconsider its decisions *sua sponte. See Matter of G–D–,* 22 I. & N. Dec. 1132 (BIA 1999); 8 C.F.R. § 3.2(a) (2003) (redesignated as 8 C.F.R. § 1003.2(a) by 68 Fed.Reg. 9824, 9830 (Feb. 28, 2003)); *cf. Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 816 n. 11 (2d Cir.2000) (assuming jurisdiction *arguendo* where there was a question as to the statutory—as opposed to constitutional—grant of jurisdiction).

Art. 1. It is this definition that lies at the heart of Khouzam's second petition for review.

On January 14, 2000, after three days of hearings, an immigration judge determined that it is more likely than not that Khouzam will be tortured if he returns to Egypt. The judge discounted large portions of Khouzam's testimony as not credible, but relied heavily on portions of the testimony by one of Khouzam's witnesses, whom the parties agreed was an expert on the judicial and penal system of Egypt. This witness testified with certainty that if petitioner were to return to Egypt, he would immediately be taken to a police station and tortured or otherwise abused before being allowed to secure an attorney. The judge also relied on the State Department Country Reports on Egypt that corroborated this testimony. The judge found

> Taken together, the evidence is overwhelming that [Khouzam] will more likely than not be subjected to torture by a responsible Egyptian government official who will breach his duty and engage in the torture of [Khouzam], or at the least, will abdicate such duty by acquiescing in such torture as defined under the regulations implementing the Torture Convention.

On July 24, 2000 the BIA affirmed this decision. The BIA found that even in actions unrelated to terrorist investigations, the local Egyptian police have "routinely tortured, abused, and killed suspected criminals to extract confessions." It concluded

> In light of the evidence that the Egyptian authorities routinely torture and abuse suspected criminals and the medical evidence indicating that [Khouzam] has scars and injuries which are consistent with past torture, ... we agree with the Immigration Judge that

[Khouzam] has established that it is more likely than not that he would be tortured if returned to Egypt.

Almost two years later, on May 7, 2002, the BIA changed its mind based on what it perceived as a change in the law. Without making any new findings of fact, the BIA decided that the acts to which Khouzam will more likely than not be subjected in Egypt do not constitute torture. Although the BIA's reasoning is not entirely clear, we understand it to be saying two things.

First, citing *Matter of J–E–*, 23 I. & N. Dec. 291 (BIA 2002), the BIA reasons that because Khouzam is essentially fleeing from prosecution for a crime, "[h]is detention and any acts perpetrated against him would ... arise from a lawful sanction" and therefore not constitute torture. If the BIA actually means this literally, it is patently erroneous. It would totally eviscerate the CAT to hold that once someone is accused of a crime it is a legal impossibility for any abuse inflicted on that person to constitute torture. Although the CAT excludes from its definition "pain or suffering arising only from, inherent in or incidental to lawful sanctions," it also lists pain or suffering inflicted for the purpose of "obtaining a confession" as an example of torture. When the Senate considered the CAT, its concern over the CAT's reference to "lawful sanctions" led it to qualify its ratification with the understanding that a state "could not through its domestic sanctions defeat the object and purpose of the Convention to prohibit torture." 136 Cong. Rec. 36,198 (1990). In directing the Attorney General to implement the CAT subject to the Senate's understandings, it was Congress' aim for the CAT's protections to extend to situations where the victim has been accused of a crime.

To the extent that the BIA's decision relies therefore on *J–E–*, 23 I. & N. Dec. 291, its reliance is misplaced. If *J–E–*

actually stood for this proposition, we would have to disapprove of it in light of Congress' clearly expressed contrary purpose. Moreover, in *J–E–*, the BIA itself acknowledged that acts inflicted against accused criminals can constitute torture. 23 I. & N. Dec. at 302–04. It found that "there are isolated instances of mistreatment in Haitian prisons that rise to the level of torture," *id.* at 302, but that the respondent in that case had simply failed to produce sufficient evidence to show that *he* would more likely than not be subjected to such mistreatment. *Id.* at 304. The BIA stated, for example, that the respondent had failed to show that the torture was "pervasive and widespread." *Id.* Since, in Khouzam's case, the BIA has already found that Egyptian police routinely torture and abuse suspected criminals, we fail to see how *J–E–* would lead the BIA to change its mind regarding Khouzam's eligibility for CAT relief.

■ The BIA's second line of reasoning is based on *Matter of Y–L–, A–G–, R–S–R–*, 23 I. & N. Dec. 270, 285, 2002 WL 358818 (A.G.2002). In that case, as the BIA stresses, "the Attorney General emphasized that acts ... must occur with the consent or approval of authoritative government officials acting in an official capacity" in order to constitute torture. The BIA implies that this requirement is not met with respect to the acts likely to be inflicted on Khouzam. Since the BIA had previously found in 2000 that the evidence pointed toward acts inflicted by "local police" or, more generally, "the Egyptian authorities," the BIA must have concluded in 2002 that these authorities would not necessarily be acting in their official capacities when carrying out the acts. Although it is hard to square this conclusion with the BIA's finding that the purpose of those acts was "to extract confessions," the more fundamental problem with the govern-

ment's reasoning is the notion that torture requires the consent or approval of government officials acting in official capacities.

The Ninth Circuit recently addressed this issue in *Zheng v. Ashcroft*, 332 F.3d 1186 (9th Cir.2003). In holding that torture does not require that acts be "willfully accept[ed]" by government officials, the Ninth Circuit concluded that Congress had spoken clearly on this subject. *See id.* at 1194. We are similarly persuaded. We start with the language of the CAT itself, and the Senate understandings subject to which Congress directed that the CAT be implemented. The CAT itself requires that torture be inflicted "by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." President Reagan signed the Convention in 1988, and then transmitted it to the Senate for advice and consent, along with 17 proposed conditions. *See* S. Exec. Rep. 101–30, at 7 (1990). One of these conditions was an understanding that acquiescence meant that the "public official, prior to the activity constituting torture, have knowledge of such activity and thereafter breach his legal responsibility to intervene to prevent such activity." *Id.* at 15. The Senate Foreign Relations Committee, however, found that these conditions "created the impression that the United States was not serious in its commitment to end torture worldwide." *Id.* at 4.

This problem was addressed two years later, when the first Bush administration submitted a revised and reduced list of proposed conditions. *See id.* In the revised list, the understanding on the definition of acquiescence now merely required the official to have "awareness" of the activity constituting torture. *See id.* at 9. The Senate Foreign Relations Committee reported that this change was intended "to

make it clear that both actual knowledge and 'willful blindness' fall within the definition of the term 'acquiescence.'" *Id.* The Committee recommended ratification subject to the revised understandings, and the Senate voted in favor of this on October 27, 1990. *See* 136 Cong. Rec. 36,198 (1990).

From all of this we discern a clear expression of Congressional purpose. In terms of state action, torture requires only that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it. Although the determinative sources here are the language of the CAT itself and the Senate's understandings, we note that the CAT's drafting history also supports our conclusion. In fact, the consent or approval requirement would have been more consistent with the text first proposed by Sweden in 1979, and it was the United States that proposed broadening this text to include acquiescence. *See* J. Herman Burgers & Hans Danelius, The United Nations Convention Against Torture 41–42 (1988). The BIA and the Attorney General have erred in adding a requirement of official "consent or approval." We therefore expressly disapprove of *Matter of Y–L–, A–G–, R–S–R–,* 23 I. & N. Dec. 270, 2002 WL 358818 (A.G.2002), insofar as it takes a contrary position.

Under a correct interpretation of the law, there would have been no basis for the BIA to vacate its July 24, 2000 decision. The fact that Khouzam has been accused of a crime does not in itself render any acts inflicted against him incapable of constituting torture. Further, the BIA's July 24, 2000 finding that the Egyptian police have routinely tortured, abused, and killed suspected criminals to extract confessions is completely at odds with the BIA's conclusion that the state action requirement has not been met.

Applying the correct legal standard to the BIA's findings *de novo,* we conclude, as the BIA itself previously did, that Khouzam will more likely than not be tortured if he is deported to Egypt. To the extent that the Egyptian police are acting in their official capacities—as is strongly suggested by the fact that their goal is to extract confessions—then the acts are carried out "by ... a public official ... acting in an official capacity." CAT, Art. 3. To the extent that these police are acting in their purely private capacities, then the "routine" nature of the torture and its connection to the criminal justice system supply ample evidence that higher-level officials either know of the torture or remain willfully blind to the torture and breach their legal responsibility to prevent it. As two of the CAT's drafters have noted, when it is a public official who inflicts severe pain or suffering, it is only in exceptional cases that we can expect to be able to conclude that the acts do not constitute torture by reason of the official acting for purely private reasons. Burgers & Danelius, *supra,* at 119.

Because we hold that the BIA erred in deciding to vacate its July 24, 2000 decision, we need not reach or rule upon the question of whether the BIA abused its discretion in deciding to reconsider that decision.

CONCLUSION

In sum, we deny Khouzam's petition to review the BIA's March 7, 2002 decision relating to asylum and withholding of removal. We grant Khouzam's petition to review the BIA's May 7, 2002 decision relating to relief under the CAT and vacate that decision. Since the May 7, 2002 decision was a reconsideration of a previous BIA decision that had granted Khouz-

am CAT relief, we let the previous decision stand.