# Matter of O-F-A-S-, Respondent

*Decided December 6, 2019*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Torturous conduct committed by a public official who is acting "in an official capacity," that is, "under color of law" is covered by the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988), but such conduct by an official who is not acting in an official capacity, also known as a "rogue official," is not covered by the Convention.

(2) The key consideration in determining if a public official was acting under color of law is whether he was able to engage in torturous conduct because of his government position or if he could have done so without a connection to the government.

FOR RESPONDENT: Amanda Perez, Esquire, Roswell, Georgia

FOR THE DEPARTMENT OF HOMELAND SECURITY: James F. Polivka, Assistant Chief Counsel

BEFORE: Board Panel: MALPHRUS, MULLANE, and CREPPY, Board Members

MALPHRUS, Board Member:

In a decision dated November 2, 2017, an Immigration Judge denied the respondent's applications for asylum and withholding of removal under sections 208(b)(1)(A) and 241(b)(3)(A) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(b)(1)(A) and 1231(b)(3)(A) (2012), and his request for protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture" or "Convention"). The respondent has appealed from that decision. The appeal will be dismissed.

## I. FACTUAL AND PROCEDURAL HISTORY

The respondent is a native and citizen of Guatemala who entered the United States on April 24, 2016, without a valid entry document. He was

subsequently placed in removal proceedings where, through counsel, he conceded removability and filed applications for relief from removal.

The respondent's persecution claim stems from an incident in Guatemala in 2016. He testified that he worked for 12 years as a salesman for a beverage distributor in Guatemala. In 2015, the respondent and six other employees were laid off, and he received a severance package of 167,000 quetzales (approximately $21,500). He used 70,000 quetzales to purchase land and cattle, and he went into the cattle business.

In the middle of 2015, a family member warned the respondent to be careful, telling him that a number of police cars had been spotted around his house. On March 13, 2016, the respondent received a phone call from an unknown person who asked him for 120,000 quetzales, stating that he knew the respondent had money. When the respondent said he had no money, the caller said, "Yes. We know you do." The caller told the respondent he must pay, or he and his associates would kill the respondent's family.

Two weeks later, on March 31, 2016, five men wearing shirts with the insignia of the Policia Nacional Civil ("PNC"), Guatemala's national police, appeared at the respondent's door carrying high-caliber firearms. The respondent opened the front door part way, and the men pushed the door open and hit the respondent in the left shoulder with a gun, causing his shoulder to dislocate. The men also handcuffed the respondent and began trashing his house, looking for money. They threatened to cut off the respondent's fingers if he did not pay them.

The respondent told the men that he had 10,000 quetzales in his car, which one of them retrieved. After he returned to the house with the money, another of the men received a phone call indicating that a neighbor had contacted the police to report a disturbance at the respondent's house and that the police were en route. At that point, the men removed the handcuffs from the respondent and told him that he had 10 days to pay the balance of the amount they demanded, or he would be killed. One man threatened to take out the respondent's good eye if he reported them to the police.[1] The respondent did not report the incident to the police. He also did not see a doctor for his shoulder injury but was, instead, treated by a layperson.

The respondent left Guatemala, entered the United States on April 24, 2016, and filed an application for asylum on September 5, 2017. After an individual hearing, the Immigration Judge issued a decision pretermitting the respondent's asylum application as time-barred. The Immigration Judge also denied the respondent's application for withholding of removal, finding that he failed to establish that it was more likely than not he would face persecution on account of a protected ground and that the Government of Guatemala was unwilling or unable to protect him from his attackers.

---

[1] The respondent lost one eye in a fireworks accident when he was 12 years old.

As to the respondent's claim for protection under the Convention Against Torture, the Immigration Judge held that the respondent did not establish that the five men who beat, robbed, and threatened him were bona fide police officers. In the alternative, the Immigration Judge held that even if they actually were police officers, the respondent did not establish that the men acted in an official capacity, as opposed to acting for personal gain, or that they acted with the consent or acquiescence of a public official or other person acting in an official capacity. For these reasons, the Immigration Judge denied the respondent's claim for protection under the Convention Against Torture. On appeal, the respondent contends that he has met his burden of proving that he is eligible for asylum, withholding of removal, and protection under the Convention Against Torture.

## II. ANALYSIS

The primary issue in this case concerns whether the men who harmed the respondent were acting "in an official capacity," that is, "under color of law" or were, instead, "rogue officials." To resolve this issue, we must look to the language of both the Convention Against Torture and the implementing legislation and regulations. *See generally INS v. Stevic*, 467 U.S. 407, 414 (1984) (beginning the analysis of the case by examining the relevant "sources of law"). We begin our analysis with the history and language of the Convention.

### A. Convention Against Torture

The United Nations Convention Against Torture was adopted by unanimous agreement of the United Nations General Assembly on December 10, 1984, and was entered into force on June 26, 1987.[2] It established "a regime for international cooperation in the criminal prosecution of torturers, relying on the principle of 'universal jurisdiction' and the obligation to extradite or prosecute." S. Exec. Rep. No. 101-30, at 2 (1990).

---

[2] Adoption of the Convention Against Torture in 1984 culminated more than a decade of efforts at the international level to prohibit the practice of torture. In 1973, the United Nations General Assembly adopted Resolution 3059 rejecting "any form of torture and other cruel, inhuman or degrading treatment or punishment." G.A. Res. 3059 (XXVIII) (Nov. 2, 1973). Two years later, it adopted the Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. G.A. Res. 3452 (XXX) (Dec. 9, 1975). The Declaration was the foundation for the Convention.

Article 1 of the Convention Against Torture defines "torture" to mean

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, *when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.* It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

(Emphasis added). According to Article 3 of the Convention,

> No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.

The United States signed the Convention Against Torture on April 18, 1988, and the President transmitted it to the Senate on May 20, 1988, with several proposed conditions. In transmitting the document, the President observed that "the Convention applies only to torture that occurs *in the context of governmental authority*, excluding torture that occurs as a wholly private act or, in terms more familiar in United States law, it applies to torture inflicted *under color of law*." Message from the President of the United States Transmitting the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20, at 4 (1988) (emphases added). After the Convention was resubmitted to the Senate with revised conditions in 1990, the Senate Committee on Foreign Relations passed a resolution of ratification for the advice and consent of the Senate. The accompanying report specifically stated that "acts of torture committed by private individuals are excluded." S. Exec. Rep. No. 101-30, at 6. These documents are critical to understanding our nation's obligations under the Convention and how we should determine what conduct is covered by it.

To implement the Convention domestically, Congress enacted section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, Division G of Pub. L. No. 105-277, 112 Stat. 2681, 2681-822 (codified as a note to 8 U.S.C. § 1231), which provides that "the heads of the appropriate agencies shall prescribe regulations to implement the obligations of the United States under Article 3 of the United Nations Convention Against Torture." *Id.* § 2242(b).

The United States Department of Justice promulgated an interim rule to implement the obligations of the United States under Article 3 in the context of removal of aliens. Regulations Concerning the Convention

Against Torture, 64 Fed. Reg. 8478 (Feb. 19, 1999). The rule created two separate provisions for protection under Article 3. *Id.* at 8489–90. The first provision established withholding of removal under the Convention for aliens who are not subject to the bars to eligibility in section 241(b)(3)(B) of the Act. *See* 8 C.F.R. § 208.16(c) (2000). The second, called "deferral of removal," provided protection for aliens who are ineligible for withholding of removal under section 241(b)(3)(B). *See* 8 C.F.R. § 208.17(a) (2000). The rule defined "torture" with respect to both withholding of removal and deferral of removal, incorporating the provision in Article 1 of the Convention that torture must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1) (2000).

The regulations governing claims raised in removal proceedings for protection under the Convention Against Torture are currently at 8 C.F.R. § 1208.16(c) through § 1208.18 (2019).[3] Under 8 C.F.R. § 1208.18(a)(1), the Convention extends to acts of torture that have been "inflicted by . . . a public official or other person acting *in an official capacity*." (Emphasis added.) The regulation, like the treaty, envisions that torture could be inflicted by a government official who is acting outside the rubric of the Convention, that is, in a personal capacity. The history and purpose of the treaty reflect that its protection was intended to apply only to torture that occurs in the context of governmental authority.

There is no indication that the Department of Justice intended to exceed the intent of the drafters of the treaty when the regulation was promulgated. Thus, under the treaty and its implementing regulation, torturous conduct committed by a public official who is acting "in an official capacity," that is, "under color of law" is covered by the Convention Against Torture, but such conduct by an official who is not acting in an official capacity, also known as a "rogue official," is not covered by the Convention.[4] "Rogue officers" or

---

[3] Prior to 2002, the regulations regarding the Convention Against Torture in Part 208 of title 8 of the Code of Federal Regulations were issued by the former Immigration and Naturalization Service ("INS"), which was part of the Department of Justice. The functions of the INS were transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, § 403, 116 Stat. 2135, 2178 (amended 2003). The Department of Justice subsequently published a final rule reorganizing title 8 to reflect the transfer of those functions and the division of jurisdiction over the regulations. *See* Aliens and Nationality; Homeland Security; Reorganization of Regulations, 68 Fed. Reg. 10,349, 10,349 (Mar. 5, 2003) (Supplementary Information).

[4] We recognize that the United States Court of Appeals for the Ninth Circuit has held that there is no "rogue official" exception to protection under the Convention Against Torture and 8 C.F.R. § 1208.18(a). *Barajas-Romero v. Lynch*, 846 F.3d 351, 362–63 (9th Cir. 2017). The court reads the regulation's use of the word "or" rather than "and" between the

"rogue officials" are public officials who act outside of their official capacity, or, in other words, not under color of law.

### 1. Under Color of Law

Although the regulations do not define the term acting "in an official capacity," the Attorney General has interpreted the phrase to mean "under color of law." *Matter of Y-L-, A-G- & R-S-R-*, 23 I&N Dec. 270, 285 (A.G. 2002) ("The scope of the Convention is confined to torture that is inflicted under color of law." (citing *Ali v. Reno*, 237 F.3d 591, 597 (6th Cir. 2001)));[5] *see also United States v. Belfast*, 611 F.3d 783, 808 (11th Cir. 2010) (noting that "there is no distinction between the meaning of the phrases 'under the color of law' and 'in an official capacity'").

Giving deference to the Attorney General's determination that acting "in an official capacity" means "under color of law," two Federal courts of appeals have drawn from their own interpretation of that phrase in civil rights

phrases "public official" and "other person acting in an official capacity" to mean that torturous conduct may be inflicted by a public official acting in a private capacity and be covered by the Convention Against Torture. This is inconsistent with our interpretation of the regulation, which, like the treaty, "deals only with torture committed in the context of governmental authority" or "inflicted under color of law." S. Exec. Rep. No. 101-30 at 6, 14; *see also* 64 Fed. Reg. at 8483.

Regarding the regulatory language, the issue is whether the phrase "acting in an official capacity" is intended to qualify only the term "other person," or if it also applies to "a public official." If the regulation is read as "a public official" or "other person acting in an official capacity," it would provide protection to persons tortured by a public official acting in a private capacity, such as a police officer, or even any government employee who acted in furtherance of his own personal objectives. In our view, this was not the intent of the Convention or the regulation, and the best reading of the regulation is that the phrase "acting in an official capacity" qualifies both "a public official" and "other person."

The Ninth Circuit's interpretation also appears to imply that the term "public official" is limited to law enforcement or security officials (local or national) who engage in torturous conduct. However, neither the Convention nor 8 C.F.R. § 1208.18(a)(1) defines the term "public official" in this manner. *See Kamara v. Att'y Gen. of U.S.*, 420 F.3d 202, 215 (3d Cir. 2005). Furthermore, its common meaning may include any person in a government position. The term therefore extends beyond law enforcement officers and could apparently encompass other government workers such as teachers and postal workers. *See generally Kasneci v. Gonzales*, 415 F.3d 202, 205 (1st Cir. 2005) (addressing a claim that alleged attacks by townspeople dressed in military uniforms "were carried out by or with the acquiescence of a public official"). This is especially true in forms of government where most employees work for the State. The broadness of the term "public official" further supports our view that it is modified by the phrase "acting in an official capacity" in the regulation.

[5]    Contrary to the respondent's argument, *Matter of Y-L-, A-G- & R-S-R-* remains good law on this point.

case law to apply it in the immigration context. *Ramirez-Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009) ("While our circuit has yet to adopt the agency's interpretation of 'in an official capacity' as the equivalent of 'under color of law' as used in the civil-rights context as reasonable, we do so now."); *see also Garcia v. Holder*, 756 F.3d 885, 891 (5th Cir. 2014) (stating that under the Attorney General's standard, "we interpret under color of law as we would in a civil rights case"). We will follow that approach in analyzing a claim involving conduct by a public official who is not acting in an official capacity, that is, a "rogue official."

We apply the law through case-by-case adjudication in removal proceedings under the Act, and in so doing, we have an obligation to promote consistency in the application of the immigration laws through Board precedent. *See Matter of M-E-V-G-*, 26 I&N Dec. 227, 248–49 (BIA 2014) (noting the role of Board precedent in defining the United States' obligations under international agreements and in establishing that claims relying on those agreements are adjudicated with consistency in removal proceedings). *See generally* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384 (stating Congress' intent that "the immigration laws of the United States should be enforced vigorously and uniformly"). While no one case and no one circuit's law is dispositive, we set forth a national standard based on the general import of civil rights law as relevant in the immigration context. *See INS v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002) (per curiam) (recognizing the importance of allowing the Board to "make an initial determination" so that it "can bring its expertise to bear" on matters that arise in the immigration context).

In the civil rights context, a public official "acts under color of law when he misuses power possessed by virtue of . . . law and made possible only because he was clothed with the authority of . . . law." *Ramirez-Peyro*, 574 F.3d at 900 (alterations in original) (citations omitted). An act that is motivated by personal objectives is under color of law when an official uses his official authority to fulfill his personal objectives. *Garcia*, 756 F.3d at 892. "The dispositive question is whether the [official] was exercising the power [he or] she possessed based on state authority or was acting only as a private individual." *Butler v. Sheriff of Palm Beach County*, 685 F.3d 1261, 1265 (11th Cir. 2012). In other words, in determining if a public official who engaged in torture was "acting in an official capacity," it is key to consider if he was only able to accomplish the acts of torture by virtue of his official status. *See United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991).

In evaluating if a public official is acting under color of law in inflicting torture, circuit courts have significantly relied on whether government connections provided the officer access to the victim, or to his whereabouts or other identifying information. For example, the United States Court of

Appeals for the Fifth Circuit determined in an extortion case that the offenders' ability to obtain information about the victim's whereabouts and his financial status from other public officials who had acquired that information in their official capacities was a strong indication that the offenders were acting in their official capacity. *Garcia*, 756 F.3d at 892–93. Two extortion attempts and threats to the victim in that case occurred shortly after he had provided required information to government officials:  first, when he applied for a national identity card, and second, when he was stopped and questioned at a police checkpoint.  *Id.*; *see also Ramirez-Peyro*, 574 F.3d 905–06 (remanding based on evidence that Mexican Government officials who, in their official capacity, obtained information about the victim's identity and whereabouts could provide that information to drug cartels who would torture and kill the victim); *United States v. Picklo*, 190 F. App'x 887, 889 (11th Cir. 2006) (per curiam) (holding that a government official who robbed a person "acted under color of law because he identified himself as a state investigator, flashed a badge, and used his official status to get [the victim] to follow his instructions").  In these cases, the person's official capacity effectively provided the means to access, locate, or harm the victim.

In contrast, in *Miah v. Mukasey*, 519 F.3d 784, 788 (8th Cir. 2008), the Eighth Circuit approved of our conclusion that an elected official who attempted to take control of other people's property was a "rogue" official because his actions fell outside of his official duties.  In determining that the official was not acting in an official capacity, we noted that other government officials did not assist him but, instead, made an effort to investigate and prosecute him criminally for his illegal activities.

Also relevant to the analysis is whether a law enforcement officer was on duty and in his official uniform at the time of his conduct.  If so, it is more likely that he acted under color of law.  However, the use of an official uniform or service weapon is not dispositive of the issue, because those items can be obtained outside the normal channels of government operations, and they may not be necessary to the official's ability to engage in the torturous conduct.  *See Barna v. City of Perth Amboy*, 42 F.3d 809, 816–19 (3d Cir. 1994) (holding that a police officer did not act under color of law, even though he was in uniform and used a government-issued nightstick to beat the victim, because he was off-duty and outside his jurisdiction, and he did not encounter the victim as part of police business); *see also Ramirez-Peyro*, 574 F.3d at 901; *Vargas Hidalgo v. U.S. Att'y Gen.*, 154 F. App'x 827, 829 (11th Cir. 2005) (per curiam).  Moreover, in general, the higher a position in law enforcement that a person holds, the more likely his conduct will be under color of law, even if his actions are taken for personal gain.  He is in a

position to more easily abuse his authority without adverse consequences than, for example, a line police officer.

A similar consideration is whether the officer threatened to retaliate through official channels if the victim reported his conduct to authorities. *See Tarpley*, 945 F.2d at 809 (holding that an assault by a police officer was under color of law where he repeatedly told the victim that, because he was an officer, he could beat and even kill the man without any consequences). In this regard, the Seventh Circuit held that, even though an officer attacked an inmate for personal reasons, he acted under color of law where he was on duty and in uniform at the time of the attack and enlisted the aid of other officers in the jail. *United States v. Christian*, 342 F.3d 744, 751–52 (7th Cir. 2003). This case reflects that consideration should be given to whether a government official is acting to fulfill purely personal objectives, but it is not dispositive of the rogue official question. By contrast, in *Almand v. DeKalb County*, 103 F.3d 1510, 1515 (11th Cir. 1997), the Eleventh Circuit determined that an officer's conduct in breaking down an apartment door and raping a woman occupant while he was in uniform was not under color of law since there was no evidence that he accomplished the act because of the power he possessed under State authority. It was, instead, an act that any "ruffian" could have done. *Id.*

It has been held that the use of government-issued equipment, such as a service weapon or handcuffs, to beat or restrain a victim does not automatically render the conduct under color of law. Rather, an Immigration Judge should consider whether a private citizen could obtain the same weapons or restrain the victim in the same manner. For example, in *Butler*, 685 F.3d at 1267–69, the court found that the officer's use of her government-issued handgun and handcuffs on the victim did not mean that she acted under color of law, because someone who is not a law enforcement officer could also own a handgun and handcuffs and use them to restrain another person.

Whether a public official's actions are under color of law is a fact-intensive inquiry, and an Immigration Judge should assess both the direct and circumstantial evidence to make this determination. When making factual findings regarding a public official's conduct, the Immigration Judge should not rely on unproven assumptions to find that the official acted under color of law. In this regard, the First Circuit affirmed our holding that a police officer did not act under color of law when he repeatedly visited the applicant's mother with other officers in uniform and asked for her daughter's whereabouts. *Costa v. Holder*, 733 F.3d 13, 18 (1st Cir. 2013). The court also noted the government's on-going efforts to combat police corruption. It concluded that the direct and circumstantial evidence was too limited to draw the inference that the officers relied on their status as law

enforcement officers to threaten the mother, stating that any contrary determination would be an "unproven assumption[]." *Id.*

In sum, the key consideration in determining if a public official was acting under color of law is whether he was able to engage in torturous conduct because of his government position or if he could have done so without any connection to the government. Issues to consider in making this determination include whether government connections provided the officer access to the victim, or to his whereabouts or other identifying information; whether the officer was on duty and in uniform at the time of his conduct; and whether the officer threatened to retaliate through official channels if the victim reported his conduct to authorities.

## 2. Acquiescence

Even if a public official has engaged in torture in a private capacity, and therefore not under color of law, an alien may nevertheless qualify for protection under the Convention Against Torture if he demonstrates that a public official or other person acting in an official capacity consented to or acquiesced in the torture. *Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004). Acquiescence requires that "the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7); *see also Silva-Rengifo v. Att'y Gen. of U.S.*, 473 F.3d 58, 67–70 (3d Cir. 2007) (stating that acquiescence includes both actual knowledge and willful blindness); *Chen v. Gonzales*, 470 F.3d 1131, 1141 (5th Cir. 2006) (same); *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006) (same); *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1242–43 (11th Cir. 2004); *Khouzam*, 361 F.3d at 171.

An applicant may establish acquiescence by citing to evidence, particularly country conditions evidence, showing that the torturous conduct is "routine" and sufficiently connected to the criminal justice system for an adjudicator to reasonably infer that higher-level officials either know of the torture or remain willfully blind to it and therefore breach their legal responsibility to prevent it. *Khouzam*, 361 F.3d at 171.

## 3. Application to the Respondent

The Immigration Judge made alternative holdings to support his denial of the respondent's claim for protection under the Convention Against Torture. First, he held that the respondent did not meet his burden of proving that the five men who beat, robbed, and threatened him were police officers. A private person who has no actual political or government affiliation is not a

"rogue official," even if he purports to be a government official. For example, an individual who impersonates a police officer by flashing a fake badge is not a rogue official because that person is not a "public official" in the first place, let alone one acting under color of law, as required by the Convention and 8 C.F.R. § 1208.18(a)(1).

The fact that the men wore shirts bearing the insignia of a government law enforcement agency and carried high-caliber weapons and handcuffs did not prove that they were actually police officers. As the Immigration Judge noted, the shirts could have been fake, and it is not unusual to expect a criminal to carry a weapon. Further, the men did not arrive at the respondent's home in police vehicles, and their immediate departure after learning that an official police car was en route to investigate the disturbance is a further indication that they were not bona fide police officers. The Immigration Judge's determination was a permissible view of the evidence, and there is no clear error in his findings in this regard.

In the alternative, the Immigration Judge held that, even if the men were police officers, the respondent did not establish that they were acting in an official capacity. He found, instead, that they were acting as rogue officials for personal gain.[6] On appeal, the respondent primarily focuses on this alternative holding, which requires us to determine when a public official acts "under color of law" and thus triggers the protections of the Convention Against Torture. He claims that the facts of his case "strongly suggest" that the men who attacked him had access to him through official police channels. Even if they were police officers, this unproven assumption is insufficient to carry his burden to show that the men were acting under color of law at the time of the attack.

The evidence does not support the conclusion that a government position gave the men special access to the respondent's house or to his private information, including the fact that he had been awarded a significant amount of money and kept the cash at his house. Although the respondent received a threatening phone call prior to the incident indicating that the caller and his associates knew he had money at the house, there is no evidence that the caller was a police officer or was associated in any way with the Guatemalan Government.

Further, the men left immediately after learning that an official police car was en route to the respondent's house to investigate the disturbance. They also threatened to take the respondent's other eye out if he reported the incident to the police, raising further doubt that they were acting with government authority. *See Suarez-Valenzuela*, 714 F.3d 241, 248 (4th Cir.

---

[6] The Immigration Judge also determined that the respondent did not establish that the five men were acting with the consent or acquiescence of a public official or other person acting in an official capacity.

2013) (finding no acquiescence where an officer tortured the applicant to keep him from testifying against the officer, thus evidencing that the officer feared official repercussions for his actions). The Immigration Judge reasoned that the men were concerned that they could be discovered by the police. He concluded that they would not have reacted in this manner if they thought they could act with impunity and had no reason to fear adverse consequences if their conduct was discovered by law-abiding officers. This was a permissible view of the evidence. *See id.*

Moreover, the fact that the men carried high-caliber weapons and handcuffs does not automatically place their conduct under "color of law" because, as the Immigration Judge explained, it is reasonable to expect that persons engaged in the criminal act of threatening and robbing others would carry weapons. *See Butler*, 685 F.3d at 1267.

Finally, it is significant that the respondent did not report the incident to the police. As a result, there is no way to evaluate whether the police would have investigated the incident and taken action against any of the attackers. *See Joaquin-Porras v. Gonzales*, 435 F.3d 172, 175, 181 (2d Cir. 2006) (upholding an Immigration Judge's finding that a police officer's rape of the alien, who did not report the incident to official authorities, was "an isolated attack by a corrupt official"); *cf. Barajas-Romero v. Lynch*, 846 F.3d 351, 355 (9th Cir. 2017) (noting that a local police officer refused to investigate an attack after the alien stated that the officer's colleagues were responsible). It is not sufficient to simply assume that the police would not have responded. *See Almutairi v. Holder*, 722 F.3d 996, 1003 (7th Cir. 2013) (stating that "because [the alien] never mentioned the threatening calls to anyone in the Kuwaiti police or military, he could only speculate that the Kuwaiti government might not protect him if he did seek its help"). For all the above reasons, we conclude that even if the men were bona fide police officers, the Immigration Judge properly determined that they were not acting under color of law.[7] We therefore concur with his denial of the respondent's claim for protection under the Convention Against Torture.

## B. Asylum and Withholding of Removal Under the Act

The Immigration Judge also properly denied the respondent's claim for asylum as time-barred because he did not file his application within 1 year of his arrival date. Section 208(a)(2)(B) of the Act. The respondent entered the United States on April 24, 2016, but did not file his asylum application until September 5, 2017. He did not identify, much less demonstrate, any

---

[7] The Immigration Judge's reasons for determining that the men were rogue officials were based on reasonable inferences that, while not dispositive as to that fact, were proper for him to make.

changed or extraordinary circumstances to excuse the late filing. *See* section 208(a)(2)(D) of the Act; 8 C.F.R. § 1208.4(a)(4)–(5) (2019). On appeal, he contends that he did not understand the instructions his prior attorney gave him on how to file the completed asylum application while he was in detention, and the attorney did not advise him of the consequences of failing to timely file. However, the respondent makes no claim that the attorney provided ineffective assistance of counsel. Nor did he comply with the procedural steps for asserting such a claim of ineffective assistance of counsel. *See Matter of Lozada*, 19 I&N Dec. 637, 639 (BIA 1988); 8 C.F.R. § 1208.4(a)(5)(iii)(A)–(C). Under these circumstances, the respondent's asylum claim was properly pretermitted.

We also agree with the Immigration Judge that the respondent did not establish eligibility for withholding of removal under the Act because he failed to prove that he was persecuted in the past or that he faces a clear probability of persecution upon his return to Guatemala. *See* section 241(b)(3)(A) of the Act; *Stevic*, 467 U.S. at 429–30; 8 C.F.R. § 1208.16(b).

Persecution is "an 'extreme concept,' requiring 'more than a few isolated incidents of verbal harassment or intimidation.'" *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1231 (11th Cir. 2005) (citation omitted). To rise to the level of persecution, the claimed physical harm generally must involve severe mistreatment. *See Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1353 (11th Cir. 2009) (finding no persecution where the applicant was detained for 4 days, interrogated and beaten for 5 hours, and subsequently monitored by authorities, but he suffered no physical harm).

The respondent has not established that he suffered past persecution because the one incident where the men threatened him, put him in handcuffs, and beat and struck him on the shoulder with the butt of a gun was not severe enough to rise to the level of persecution. He was briefly detained in his home and did not suffer any permanent physical injury or seek formal medical attention from a doctor for his shoulder injury, being treated by a lay person instead. *See Martin v. Sessions*, 723 F. App'x. 35, 37–38 (11th Cir. 2018) (stating that an alien who did not testify that he suffered any injuries or sought medical treatment did not establish that the harm he alleged rose to the level of past persecution); *Jian Qiu Liu v. Holder*, 632 F.3d 820, 822 (2d Cir. 2011) (per curiam) (finding that an alien who "suffered only minor bruising from an altercation . . . , which required no formal medical attention and had no lasting physical effect" had not experienced past persecution).

In the absence of past persecution, the respondent is not entitled to a presumption of a clear probability of future persecution. *See* 8 C.F.R. § 1208.16(b)(1). He has not presented evidence that anyone is looking for him or asking about his whereabouts. On this record, the respondent did not establish past persecution or a clear probability of future persecution to

meet the high burden of proof to qualify for withholding of removal. *See Chen v. Gonzales*, 470 F.3d 1131, 1138 (5th Cir.2006) (stating that "the requirement of 'clear probability' of persecution requires the applicant to show a higher objective likelihood of persecution than that required for asylum"); *Matter of Y-B-*, 21 I&N Dec. 1136, 1139 (BIA 1998); 8 C.F.R. § 1208.16(b)(2).

Further, the Immigration Judge did not clearly err in finding that the respondent failed to establish that the Government of Guatemala is unwilling or unable to protect him from the men who threatened and beat him. An alien "who alleges persecution by a private actor must prove that his home country is unwilling or unable to protect him" because the Act only protects him "against persecution by non-governmental groups that *the government cannot control*." *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 950 (11th Cir. 2010) (citation omitted); *see also De Castro-Gutierrez v. Holder*, 713 F.3d 375, 381 (8th Cir. 2013) (stating that "an alien seeking to establish persecution based on the violent conduct of private actors must show more than 'difficulty controlling' private behavior" (citation omitted)); *Matter of A-B-*, 27 I&N Dec. 316, 337 (A.G. 2018) (same). It was proper for the Immigration Judge to find that the reason the respondent's attackers fled when they learned an official police car was en route was that they feared bona fide police officers were coming to the respondent's aid. *See Guillen-Hernandez v. Holder*, 592 F.3d 883, 887 (8th Cir. 2010) (stating that certain evidence reflected that the applicant "fear[ed] punishment at the hands of a government ready and willing to enforce its criminal laws").

The respondent also did not report the threatening phone call or the incident at his house to the police, and there is no showing that it would have been futile to do so. *See Mulyani v. Holder*, 771 F.3d 190, 199 (4th Cir. 2014) (noting that the alien "never notified the police or any other governmental authorities" about the attacks on her, and her claim that the government was unable or unwilling to control her attackers was belied by the fact that they fled when a man nearby yelled at them). We recognize that failure to report persecution to local authorities does not automatically bar an alien from asylum and withholding of removal. *See Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1345 (11th Cir. 2007). However, a failure to report "generally is fatal" to a persecution claim unless the alien can show it would be futile to make a report, which the respondent did not do. *Id.* (citing *Mazariegos v. Office of U.S. Att'y Gen.*, 241 F.3d 1320, 1327 (11th Cir. 2001)); *cf. Matter of S-A-*, 22 I&N Dec. 1328, 1335 (BIA 2000) (excusing the applicant's failure to request protection from the Moroccan Government as futile).

The country conditions evidence in the record that reported on crime and safety issues in Guatemala also does not establish that it would have been

futile for the respondent to report the beating incident to the police.  *See* U.S. Dep't of State, Bureau of Diplomatic Sec., Overseas Security Advisory Council, Guatemala Crime Safety Report (2017, 2018).  Although the reports reflect that the PNC lacks personnel and training to control gang activity and that police investigations typically do not result in an arrest or a conviction, they also indicate that the PNC has made some progress in the reduction of crimes.  Further, the fact that the police were dispatched to the respondent's home when they were called is evidence that the Immigration Judge reasonably considered in finding that it would not have been futile for the respondent to report the beating incident.  Consequently, we conclude that the Immigration Judge properly denied the respondent's application for withholding of removal under the Act.[8]

## III.  CONCLUSION

The Immigration Judge properly denied the respondent's application for protection under the Convention Against Torture.  He determined that the men who beat, robbed, and threatened the respondent were not public officials and, even if they were, they were not acting in an official capacity and were therefore rogue officials.  Further, the Immigration Judge properly concluded that the respondent did not establish his eligibility for asylum and withholding of removal under the Act.  Accordingly, the respondent's appeal will be dismissed.

**ORDER:**  The appeal is dismissed.

---

[8]  The Immigration Judge also held that the respondent's proposed social group was not cognizable under the Act.  However, given our disposition of the appeal on other grounds, we need not address this aspect of the decision.